**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF OREGON**
**PORTLAND DIVISION**

| | | |
|---|---|---|
| RHONDA W. WILCOX, | ) | |
| | ) | |
| Plaintiff, | ) | No. 03:09-cv-06349-HU |
| | ) | |
| vs. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | **FINDINGS AND RECOMMENDATION** |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

_____

Robert Baron
Kathryn Tassinari
Harder, Wells, Baron & Manning, P.C.
474 Willamette, Suite 200
Eugene, OR 97401

    Attorneys for Plaintiff

Dwight C. Holton
United States Attorney
Adrian L. Brown
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2904

David Morado
Regional Chief Counsel
Seattle, Region X
Thomas M. Elsberry
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 5th Avenue, Suite 2900 M/S 221A
Seattle, WA 98104-7075

    Attorneys for Defendant

1 - FINDINGS AND RECOMMENDATIONS

1

2

3                          *TABLE OF CONTENTS*

4

5   *I.     PROCEDURAL BACKGROUND.* . . . . . . . . . . . . . . . . *3*

6   *II.    FACTUAL BACKGROUND..* . . . . . . . . . . . . . . . . . *4*

7       *A.     Summary of the Medical Evidence..* . . . . . . . . . *4*

8       *B.     Summary of the Vocational Evidence.* . . . . . . . . *55*

9       *C.     Wilcox's testimony.* . . . . . . . . . . . . . . . . *60*

10          *1.     Pain Questionnaire..* . . . . . . . . . . . . . *60*

11          *2.     Activities of Daily Living and Socialization..* *61*

12          *3.     August 29, 2006, Hearing..* . . . . . . . . . . *63*

13          *4.     March 13, 2007, Hearing.* . . . . . . . . . . . *66*

14      *D.     Third-Party Testimony..* . . . . . . . . . . . . . . *68*

15  *III. DISABILITY DETERMINATION AND BURDEN OF PROOF..* . . . . . *70*

16      *A.     Legal Standards..* . . . . . . . . . . . . . . . . . *70*

17      *B.     The ALJ's Decision.* . . . . . . . . . . . . . . . . *73*

18  *IV.  STANDARD OF REVIEW..* . . . . . . . . . . . . . . . . . . *77*

19  *V.   DISCUSSION..* . . . . . . . . . . . . . . . . . . . . . . *78*

20      *A.     Knee arthritis.* . . . . . . . . . . . . . . . . . . *78*

21      *B.     Credibility analysis.* . . . . . . . . . . . . . . . *81*

22      *C.     Rejection of Dr. Weller's opinions.* . . . . . . . . *85*

23      *D.     Consideration of Steven Wilcox's statements..* . . . *88*

24      *E.     Wilcox's ability to work.* . . . . . . . . . . . . . *89*

25  *VI.  CONCLUSION..* . . . . . . . . . . . . . . . . . . . . . . *90*

26  *VII. SCHEDULING ORDER..* . . . . . . . . . . . . . . . . . . . *91*

27

28

Hubel, United States Magistrate Judge:

The plaintiff Rhonda W. Wilcox seeks judicial review pursuant to 42 U.S.C. § 405(g) of the Commissioner's final decision denying her application for Disability Insurance ("DI") benefits under Title II of the Social Security Act, 42 U.S.C. § 1381 *et seq.* Wilcox argues the Administrative Law Judge ("ALJ") erred in weighing the evidence, and in concluding that Wilcox retains the ability to work.  Dkt. #13.

## I. *PROCEDURAL BACKGROUND*

Wilcox lives with her husband and two children in Eugene, Oregon.  She initially alleged disability as of May 3, 2000, due to a "[b]ack condition; sciatic nerve damage; [and] muscle weakness." (A.R. 122)  She protectively applied for DI benefits on April 27, 2004.  (A.R. 108-10)  Her application was denied initially and on reconsideration.  (A.R. 40-42, 46-50, 58-59)  She requested a hearing (A.R. 50), and a hearing was held before an ALJ on May 3, 2006.  (A.R. 676-89)  Wilcox was fifty years old at the time of the hearing.  She asked that the hearing be continued to allow her to obtain representation.  Her request was granted, and the next hearing was held on August 29, 2006 (A.R. 690-718).  The ALJ determined that a consultative medical examination would be appropriate, so the hearing was adjourned, and then reconvened on March 13, 2007 (A.R. 719-56) At this third hearing, Wilcox amended her alleged onset date to October 1, 2005.  (A.R. 722)

On July 26, 2007, the ALJ issued his decision, finding that although Wilcox suffers from severe impairments including "degenerative disc disease of the lumbar spine, obesity, and

3 - FINDINGS AND RECOMMENDATIONS

affective disorder" (A.R. 26), and she is unable to return to any of her past work (A.R. 33), she retains the residual functional capacity to perform light work with certain restrictions. (A.R. 29; *see* A.R. 29-33) Wilcox requested review, and submitted additional evidence for consideration by the Appeals Council. (*See* A.R. 10) On October 7, 2009, the Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner.

Wilcox filed a timely Complaint in this court, requesting judicial review. Dkt. #2. Wilcox filed a brief in support of her claim, Dkt. #13, to which the Commissioner has responded, Dkt. #14, and Wilcox has filed a reply, Dkt. #15. The matter is now fully briefed. The undersigned submits the following Findings and Recommendation for disposition of the case pursuant to 28 U.S.C. § 636(b)(1)(B).

## II. FACTUAL BACKGROUND

### A. Summary of the Medical Evidence

Wilcox apparently sustained some type of on-the-job injury on August 4, 1999. (*See* A.R. 246) On October 15, 1999, Betty Berry, a representative of SAIF Corporation[1], completed a "Job Analysis" form regarding Wilcox's job. (A.R. 246-47) Berry indicated Wilcox was employed in the job of "[d]riving [a] bus on prescribed routes." (A.R. 246) The form is instructive here because it lists the job requirements for a bus driver; i.e., sitting 95% or more of

_____

[1]"SAIF Corporation is Oregon's not-for-profit, state-chartered workers' compensation insurance company." http://www.saif.com/aboutsaif/aboutsaif.aspx (visited 06/06/11)

the day, and standing the remainder of the day; limited walking, just to and from the bus; minimal opportunity to change positions; no lifting or carrying; the need to operate a steering wheel, door controls, farebox, and transfer punch; the need to reach overhead, and to reach and handle seatbelts; infrequent sitting or squatting; minimal twisting; climbing of three to five steps to board the bus; no crawling; the need to use a pencil, transfer punch, route guide, computer, and key pad; and environmentally, exposure to exhaust fumes both in the bus, and outdoors while getting into and out of the bus. (R. 246-47)

Wilcox fell at work in late November or early December 1999, after "working a 19 hour day." (A.R. 382)  She was off work for three weeks, returning to work part-time in early January 2000. Mattox L. Purvis, Jr., M.D. advised her to remain on part-time work for two additional weeks, and then she could return to full-time work with no extended duty. (*Id.*)

On May 3, 2000, Wilcox was driving a school bus when the bus was rear-ended by a passenger van.  Wilcox was required to exert considerable pressure on the brakes in order to stop the bus.  A seat from the bus ran into her, impacting the back of her right hip and the side of her right thigh.  She immediately felt some low back pain, and a few hours later she started to feel pain in her right leg.  She saw Kurt Brewster, M.D. at an urgent care facility, and he diagnosed her with "[l]umbar strain with associated musculoskeletal pain." (A.R. 381, 527)  He opined her symptoms could be treated with only medications, and he prescribed Xanax for muscle relaxation, and Tylenol #3 and Ibuprofen for pain. (A.R. 527)

5 - FINDINGS AND RECOMMENDATIONS

1    On May 6, 2000, Wilcox saw Dr. Purvis, requesting a work
2 release.  She thought she probably would be able to return to work
3 the following Monday.  She was ambulating without difficulty, and
4 although she had some soreness, the doctor did not observe any
5 bruising or soft tissue discoloration.  (A.R. 381)  Dr. Purvis gave
6 her a work release indicating she could only drive for "up to 30
7 minutes" at a time, and she should not lift or bend.  (A.R. 525)

8    On May 31, 2000, Dr. Purvis noted that Wilcox had attempted to
9 return to work "but was only able to manage it for about 10 minutes
10 before the pain in the right hip and buttock area went out of
11 control again."  (A.R. 380)  He noted Wilcox would be unable to
12 return to active driving at that time, and he wrote a work release
13 for her to be off work for two weeks, and then "placed on
14 alternative duty status 8 hours with 3 hours sitting, 3 hours
15 standing and 2 hours walking." (*Id.*)

16    On June 12, 2000, Wilcox was seen at an occupational medicine
17 clinic ("OM clinic") for evaluation.  She complained of "right low
18 back/right buttock/right inner thigh pain," and "pain with
19 bending."  (A.R. 596)  She was referred to physical therapy for
20 evaluation and treatment. (*Id.*)

21    Wilcox began physical therapy on June 14, 2000, on referral
22 from Paul Panum, M.D.  (A.R. 344-45)  Wilcox's chief complaints
23 consisted of "pain on the right side of the back, buttock and groin
24 and the condition is unchanging, intermittent in the back, buttock,
25 thigh."  (A.R. 344)  She reported that her condition worsened with
26 "sitting, rising, bending, standing, also with lifting, cough,
27 sneeze." (*Id.*)  She had disturbed sleep two to three times each
28 night, and her daily activities had been reduced by 30% due to her

6 - FINDINGS AND RECOMMENDATIONS

symptoms. (*Id.*)   Her rehabilitation potential was noted to be "[g]ood depending on confirmation of mechanical diagnosis, patient compliance, [and] response to treatment."  (A.R. 345)

On June 16, 2000, Wilcox reported that she was doing home exercises ten times daily.  Although the pain in her buttock and thigh was better and she was sleeping better, her back pain was worse.  (A.R. 343)  On June 19, 2000, Wilcox reported doing exercises seven times a day.  She stated the exercises were "really helping."  However, on June 18, 2000, she had been sitting on the floor, and when she got up, her pain level increased.   The therapist instructed her "in lateral compartment techniques that immediately abolished hip and groin symptoms." (A.R. 342)

Wilcox was seen at the OM clinic for followup on June 19, 2000.  She continued to have "persistent right low back/right hip pain in a sciatica distribution," and she was not sleeping well due to pain.   (A.R. 595)   She was directed to continue physical therapy.  Notes indicate Wilcox was scheduled to return to work the next day, and she was given restrictions including a ten-pound lifting limit, minimized twisting and bending, and no prolonged sitting. (*Id.*)

On June 22, 2000, Wilcox reported to the physical therapist that she was exercising two to three times a day, with decreased walking.  She stated the exercises relieved her symptoms, but they later returned.  She was instructed in different techniques to use throughout the day.  (A.R. 341)  One June 26, 2000, she reported sleeping better and estimated her improvement at "about 30%." (A.R. 340)   She stated sitting greatly increased her pain. Exercises relieved her symptoms, but they returned in about thirty

7 - FINDINGS AND RECOMMENDATIONS

1  minutes.  She was encouraged to continue "aggressive use of self
2  treatment." (*Id.*)

3      Wilcox was seen at the OM clinic on June 26, 2000.  She was
4  somewhat improved, and was finding the physical therapy exercises
5  a bit more comfortable.  She still was unable to sit for any length
6  of time without increased pain in her right lower back/right leg.
7  She also was unable to stand for any length of time, and needed to
8  be able to move about.  She stated her back exercises would reduce
9  her pain for about half an hour.  Notes indicate Wilcox "should be
10 able to return to modified work, 10 pounds lifting limit.  Minimize
11 twisting or bending.  No driving at this time.  Change positions
12 frequently."  (A.R. 594)

13     At Wilcox's June 27, 2000, physical therapy appointment, she
14 reported significant improvement over the previous 24 hours.  She
15 had doubled the frequency of her exercises at work, and stated she
16 felt better than she had in the past six weeks.  (A.R. 339)  Wilcox
17 continued to report "doing very well" on June 30, 2000.  (A.R. 338)
18 On July 3, 2000, she reported doing her exercises six times a day,
19 with increased standing and walking.  She was sleeping better and
20 had eliminated use of pain medications.  She stated her pain was
21 "much better," noting she had "only had 2 episodes of pain and the
22 exercises eli[]minated it immediately." (A.R. 337)

23     Wilcox was seen at the OM clinic on July 6, 2000.  She was
24 having less difficulty with the physical therapy exercises, but
25 some exercises continued to cause her pain.  She was "somewhat
26 upset and tearful and concerned about her job stability" due to her
27 inability to drive a bus.  (A.R. 593)  She was released for
28 modified work with no lifting, pushing, or pulling over fifteen

8 - FINDINGS AND RECOMMENDATIONS

pounds; no driving or operating heavy equipment; and minimized twisting and bending. (*Id.*)

When Wilcox returned to physical therapy on July 7, 2000, she reported that her pain was worsening again due to "too much sitting on the buses." (A.R. 336)  According to Wilcox, Dr. Panum had opined she was not ready to return to driving yet.  She was directed to increase the frequency and duration of her exercises, and "[u]tilize better body mechanics and posture." (*Id.*)  On July 12, 2000, Wilcox reported "making steady gains." (A.R. 335) Her pain generally was located in her back, and she noticed a marked difference when she did not sit for long periods.  She stated she could sit comfortably for only thirty minutes, although she could tolerate up to forty-five minutes.  She expressed "concern[] about the long term problems with sitting all day while driving." (*Id.*)  The therapist noted:

> Patient improving as long as she limits her sitting tasks both in duration and frequency. This limitation may have some long term ramifications on returning to full time driving that requires long periods of uninterrupted sitting.  Progression of return to driving activities would [require] short periods only with frequent task changes.

(*Id.*)

Wilcox was seen at the OM clinic on July 13, 2000, for followup.  She was showing some improvement, and was released to modified work with a fifteen-pound lifting limit, minimized twisting and bending, and driving the bus for only two hours per day. (A.R. 592)

Wilcox reported improvement at her July 14 and 19, 2000, physical therapy sessions. (A.R. 333-34)  On the 19th, she stated

Dr. Panum had "assigned [her] to 2 hours / day of driving." (A.R. 333)  At the OM clinic on July 21, 2000, Wilcox stated she was "better."  She was driving the bus two hours per day and that was going well for her.  She had increased her walking, and she was able to exercise briefly at intervals during the time she was driving.  She was released to drive "four hours per day with no other prolonged sitting work during the day and interrupting these four hours in two two-hour segments," with a ten-pound lifting limit.  (A.R. 591)

On July 27, 2000, Wilcox reported to the physical therapist that she was "tolerating about 90 minutes of driving," broken up by standing/walking at stops. (A.R. 332)  She was doing four hours of driving with a split shift, but noted she was not pain-free towards the end of her shift. (*Id.*)  The therapist noted "some concerns about the complete resolution of this mechanical problem if she returns to driving full time." (*Id.*)  She opined Wilcox might "need to be in a situation that combines driving and standing/ walking tasks daily," and she suggested Wilcox try "driving a split shift @ 3 hrs and 2 hours after her vacation." (*Id.*)

At the OM clinic on July 28, 2000, Wilcox complained of marked worsening of her symptoms that morning.  She had been assigned to a different type of bus with a seat that was not well cushioned, and she had "developed low back worsening pain and burning discomfort into the buttocks and down both legs." (A.R. 590) Standing and stretching provided some relief.  She was sent home with directions for bed rest. (*Id.*)  On July 31, 2000, she was much improved but she exhibited "decreased range of motion compared prior to driving the bus." (A.R. 589)  She was returned to

10 - FINDINGS AND RECOMMENDATIONS

modified work with a ten-pound lifting limit; minimized twisting and bending; no driving a bus or heavy equipment, and no riding on the bus; and change of positions frequently. (*Id.*) Wilcox saw the physical therapist the same day and was advised to use "aggressive" self treatment over the next five days while she was on vacation. (A.R. 331)

When Wilcox returned from vacation, she was seen at the OM clinic on August 7, 2000, for recheck. Her pain was improved, and primarily centralized in her low back. She was released to return to "driving four hours a day in at least two split shifts," with "a driver's seat that is well cushioned and that does not bottom out." (A.R. 612)

Wilcox saw the physical therapist on August 7, 2000, and reported doing "much better than one week ago." (A.R. 320) Her leg symptoms were completely gone and her pain was "remaining in the back off to the right side." (*Id.*) She planned to bid for a split shift position for the fall. (*Id.*) She reported continuing steady progress at her physical therapy session on August 14, 2000, noting she would be sore after driving for two hours, but the pain would clear in about 30 minutes. (A.R. 329) The therapist anticipated Wilcox should "be able to tolerate an additional hour of driving within one week[.]" (*Id.*) She noted Wilcox's compliance with her treatment regimen was "excellent." (*Id.*)

Wilcox was seen at the OM clinic on August 16, 2000. She reportedly was "sore," and stated she was "working on a bus that require[d] her to be strapping in wheelchairs which require[d] more bending than usual. . . ." (A.R. 587) Otherwise, she was "tolerating the split shift well." (*Id.*) She was released to

11 - FINDINGS AND RECOMMENDATIONS

increase her driving to five hours per day, broken into at least two shifts, with "a well cushioned seat." (*Id.*)

On August 22, 2000, Wilcox told the physical therapist she has been working a five-hour split shift for three days.  She was "stiff on the right side" when she got up out of her seat.  (A.R. 328)  The therapist noted: "Although sitting tolerance is what is needed for this patient to tolerate her job, increasing sitting tolerance is not in the best long term interest of prevention for this patient's problem.  She may need a long term combination of driving and other tasks." (*Id.*)

Wilcox was seen at the OM clinic on August 24, 2000.  She was continuing to improve and was working five-hour shifts, split into three hours and two hours.  She was released to drive six hours per day, still in split shifts.  (A.R. 586)

Wilcox reported to the physical therapist on September 6, 2000, that she had bid on a new job that would require her to drive two hours in the morning and 5.5 hours in the evening.  (A.R. 327)  When she was seen at the OM clinic on September 8, 2000, she stated she continued to have "pain in both buttocks and more primarily into the right sciatic area."  (A.R. 585)  She was "doing split shift at six hours a day and then standing to answer the phone or sitting to answer the phone[.]" (*Id.*)  Wilcox opined she would do just as well driving the bus on a split shift basis.  She was released to return to work eight hours per day "as long as she is doing a split shift." (*Id.*)

Wilcox was seen for followup at the OM clinic on September 15, 2000.  She was doing well working full time with the split shift, although she reported being fatigued by the end of the day.  Notes

12 - FINDINGS AND RECOMMENDATIONS

1    indicate, "With the current work status of split shift eight hours
2    per day and 40 hours per day [sic] she is able to perform
3    essentially the full function of her work, though, the split shift
4    requirement is not a part of the usual work status, nor is the 50
5    hour per week a part of the full function for the organization."
6    (A.R. 584)

7        At Wilcox's September 20, 2000, physical therapy session, she
8    reported that she was tolerating the split shift of driving, but by
9    the end of the week, she was experiencing increased pain.  (A.R.
10   326)  On September 25, 2000, she stated she was seeing a pattern to
11   her pain.  She tolerated driving from Monday through Wednesday, but
12   on Thursday and Friday, she had "increased pain and difficulty
13   tolerating driving."  (A.R. 325)  She also was "having many other
14   personal issues" impacting her condition. (*Id.*)  The therapist
15   wanted to get Wilcox started on exercises in the pool. (*Id.*)  A few
16   days later, on September 29th, Wilcox reported her status was
17   unchanged.  She had not had time to begin the pool exercise
18   program, but planned to do so when she returned from vacation.
19   (A.R. 324)  On October 10, 2000, Wilcox reported that she was doing
20   "very well with the combination of activities [the therapist]
21   designed."  (A.R. 323)

22       Wilcox was seen at the OM clinic on October 16, 2000.  She was
23   doing the split shift "without difficulty."  (A.R. 583)  She had
24   begun water therapy, which she indicated was improving her
25   discomfort, and she continued to try to increase her activity
26   level. (*Id.*)

27       At physical therapy on October 18, 2000, Wilcox stated the
28   pool program was going well, but driving was "still somewhat

challenging." (A.R. 322)  The therapist noted Wilcox's condition was stabilizing, and she should "be ready for discharge in 4 weeks." (*Id.*)  When Wilcox returned for followup on October 20, 2000, she reported that she had no pain while she was in the pool. (A.R. 321)  She reported "doing better" on October 30, 2000, with "some fluctuations in pain but generally managing well."  (A.R. 320)

Wilcox returned to the OM clinic on November 22, 2000.  She reported continued slow improvement "both in flexion and extension and tolerance at work."  (A.R. 582)  She was not fatiguing as rapidly, and was hopeful she could return to a regular eight-hour shift by February.  Notes indicate she was not considered to be "medically stationary" yet for purposes of working a regular eight-hour shift, and she was directed to continue working the split shift. (*Id.*)

Wilcox next saw the physical therapist on November 28, 2000. She stated she was "doing OK in [her] back but having some slight achiness in [her] right leg pain."  (A.R. 319)  She was still finding the split shift somewhat difficult to tolerate. (*Id.*)  The therapist suspected Wilcox was "having a mild flare-up with discogenic pain," and she therefore did not discharge Wilcox, but instead directed her to engage in aggressive self-treatment for the next week. (*Id.*)

Wilcox saw Dr. Purvis on December 4, 2000.  His notes indicate Wilcox was "very anxious and upset about her recurring spasms in the legs and sciatica type pain and inability to ambulate[.]" (A.R. 379)  She also was noted to be "tearful at times, [and] depressed." (*Id.*)  The doctor prescribed an antidepressant, refilled Wilcox's

14 - FINDINGS AND RECOMMENDATIONS

blood pressure medication, and directed her to return for followup in about three weeks. (*Id.*)

Wilcox's back pain was better by December 5, 2000, but she was still having achiness in her leg.  Physical therapy notes indicate her status was "waxing and waning."  (A.R. 318)  Her status remained unchanged on December 11, 2000.  (A.R. 317)  On December 13, 2000, she was seen at the OM clinic.  She complained of continuing pain and discomfort, and notes indicate she seemed to be "plateauing without any persistent improvement."  (A.R. 609)  Sitting and walking aggravated her pain.  An MRI was scheduled, and she was directed to remain on the split shift. (*Id.*)

Wilcox missed her scheduled physical therapy appointment on December 26, 2000.  (A.R. 316)  She was seen at the OM clinic on December 27, 2000.  She continued to have persistent pain despite physical therapy, and recently had been having difficulty walking.  She wanted to return to a regular, full shift so she could "use some muscle relaxant pain medication at night time[.]"  (A.R. 581)  She was looking for a shift that would allow her to get of the bus and do stretching exercises during the day.  On examination, she had "excellent full flexion and extension with straight leg raising on the right at 90 degrees." (*Id.*)  She was directed to limit her work to 40 hours per week, and to continue doing exercises during the day. (*Id.*)

Wilcox saw Dr. Purvis on December 29, 2000.  Notes indicate her back was improving slowly.  Although she "apparently now [has] a herniated disc at L4-5," she was "certainly not eager to consider surgery."  (A.R. 379)  She requested and received a lower dose of the antidepressant. (*Id.*)

15 - FINDINGS AND RECOMMENDATIONS

1    When Wilcox returned to physical therapy on January 5, 2001,
2    she reported that symptoms in her buttock, thigh, and calf were
3    worse.  She had decreased her walking.  She stated a recent MRI
4    confirmed the presence of a disc problem.  She planned to try to
5    get off of the split shift and increase her walking.  Pain in her
6    right leg continued to come and go, and was not responding to her
7    exercises.   The therapist suspected "irreducible derangement."
8    (A.R. 315)  She advised Wilcox to walk only if her leg pain did not
9    get worse.  (*Id.*)

10    On January 17, 2001, Wilcox reported to the physical therapist
11    that her leg symptoms were not improving.  Her pain was relieved
12    only "by some of the exercise and use of the water."  (A.R. 314)
13    The therapist noted Wilcox might "not be a candidate for further
14    mechanical treatment."  (*Id.*)   Her assessment was "[u]nstable
15    derangement, probably not reducible [at] this juncture."  (*Id.*)

16    Wilcox saw Dr. Purvis on January 19, 2001, reporting that her
17    back pain was improving gradually.  (A.R. 379)  On January 22,
18    2001, the physical therapist noted Wilcox should be assessed by a
19    doctor, and Wilcox indicated she was "ready to have a neurosurgery
20    consult to gain more information."  (A.R. 313)  She was directed to
21    continue self treatment as needed for her comfort.  (*Id.*)

22    Wilcox went to the OM clinic for followup on January 30, 2001.
23    She stated she had "good days and bad days, some . . . more
24    difficult than others."  (A.R. 606)  She was starting a new route
25    at work, driving eight hours without breaks, which Wilcox thought
26    would be easier for her because the split shift required "longer
27    hours at work and also driving to and from work twice."  (*Id.*)  An
28    MRI scan showed "a large central disk herniation, minimally

16 - FINDINGS AND RECOMMENDATIONS

eccentric to the left L4-5." (*Id.*)  Her status was discussed with her at length, including "her very patient tolerance of the problem, and very faithful physical therapy with no consistent improvement." (*Id.*)  She was directed to schedule an appointment with a surgeon to discuss surgical options. (*Id.*)

On February 12, 2001, Wilcox saw Catherine J. Gallo, M.D. for a surgical consultation.  Dr. Gallo noted Wilcox had undergone a course of physical therapy, originally receiving good results, but with diminishing effects over time.  When her pain became constant, she obtained an MRI, and then was referred to the neurosurgeon for consultation.  (A.R. 234)

Wilcox described her pain as consisting of "a constant ache in the low back with some burning and stabbing pain on the right side," and aching in her right leg with "some severe burning in the lateral thigh and calf."  (*Id.*)  She denied numbness and tingling, but noted her right leg seemed to be weaker overall and she reported some trouble walking.  She stated she was still driving a school bus, but "sitting for long stretches of time exacerbate[d] the pain."  (*Id.*)

Dr. Gallo observed Wilcox to be a "[w]ell-developed, well-nourished female in no acute distress," with a height of 5'5" and weight of 260 pounds.  The doctor noted a "large central disc herniation at L4/5" (A.R. 236), and she recommended a lumbar microdiscectomy, given Wilcox's lack of improvement with conservative management over time.  The doctor cautioned Wilcox that her weight increased the risk that surgery would not be successful in relieving her pain, and also would increase the risk of

17 - FINDINGS AND RECOMMENDATIONS

complications. Wilcox was directed to think things over and call the doctor when she had made a decision. (*Id.*)

Wilcox was seen at the OM clinic on February 20, 2001, "for recheck of her herniated lumbar disk." (A.R. 580) Wilcox wanted to "continue her current work status which is a regular route with essentially no limitations," and attempt to lose some weight prior to surgery. (*Id.*) She was doing home exercises, and continued to walk daily, though she noted she was "slower than . . . in the past." (*Id.*) She was directed to continue her current work status, and continue doing her exercises. (*Id.*)

Wilcox was seen in the emergency room on March 15, 2001, for an acute exacerbation of her back pain, which she stated was "one of the worse exacerbations . . . since the original injury." (A.R. 603) She was treated with Vicodin, put on two days of bed rest, and then directed to "do some limited duty work." (*Id.*)

Wilcox returned to the OM clinic on Tuesday, March 20, 2001, for followup. She reported spending most of her time at home in bed since her trip to the E.R. When she was up for any length of time, she would have "spasm in her right low back, burning discomfort, and spasm down into the posterior thigh of the right leg." (A.R. 610) She was noted to be very tearful. She was assessed as "unable to work at this time," and was directed to follow up with Dr. Gallo. (*Id.*)

Wilcox saw Dr. Gallo for followup on March 22, 2001. She reported that over the previous two weeks, her pain had been "much worse," and she had experienced some episodes of urinary and bowel incontinence and diarrhea. The doctor recommended that Wilcox proceed with the surgery in the near future, and Wilcox agreed to

18 - FINDINGS AND RECOMMENDATIONS

1  have the procedure done the following week as an outpatient.
2  Dr. Gallo also noted it was unclear whether Wilcox would be able to
3  return to driving a school bus.  (A.R. 233)

4      Wilcox underwent a right L/4-5 microlumbar discectomy on
5  March 27, 2001.  (A.R. 240-41)  She was discharged with Percocet
6  for pain, but soon began having itching in her arms and thought her
7  throat felt hot and red.  She  called Dr. Gallo, who changed her
8  medication to Vicodin.  She began having similar symptoms and "felt
9  quite anxious," but by the time she arrived at the E.R., all of her
10  symptoms had resolved.  The doctor opined her symptoms might be
11  anxiety related, as he could identify no objective findings to
12  account for her symptoms.  She wanted "to just take Tylenol and
13  Motrin," and discontinue any other pain medications, but she also
14  asked for something to "help calm her nerves." (A.R. 389)  She was
15  given a prescription for Xanax, and directed to follow up with
16  Dr. Purvis and Dr. Gallo as soon as possible.  (A.R. 390)

17      When Wilcox saw Dr. Gallo for followup on April 16, 2001, she
18  was "not having much in the way of back or leg pain." (*Id.*)  Her
19  bladder function was "much improved," and she had not had any more
20  episodes of bowel incontinence.  Dr. Gallo released her "to light
21  duty doing survey work with no lifting [over ten pounds]." (*Id.*)
22  She also prescribed a course of physical therapy.  (*Id.*)

23      Wilcox saw Dr. Purvis on April 17, 2001.  She stated her back
24  condition was "much improved" since her surgery.  (A.R. 378)

25      Wilcox saw a Physician's Assistant at Dr. Gallo's office on
26  April 18, 2001, with "concerns regarding wound healing and her
27  return to work status." (A.R. 232)  Wilcox's daughter had noticed
28  redness and irritation at the incision site, and Wilcox reported a

19 - FINDINGS AND RECOMMENDATIONS

stinging sensation at the site when she used soap.  The P.A. opined
the irritation was "just some inflammation from sitting or rubbing
against her clothing." (*Id.*)  The P.A. recommended dry heat packs
and a protective dressing.  Wilcox also indicated "she was expected
to return to work this week, but [could] not stand or sit for
longer than fifteen minutes with[]out experiencing discomfort," and
her job required "prolonged standing and sitting." (*Id.*)  The P.A.
extended Wilcox's time off work for two additional weeks. (*Id.*;
A.R. 242)

    Wilcox was seen at the OM clinic on April 20, 2001, for
recheck of her low back incision.  There was some hardness at the
incision site, but no evidence of a cyst.  She was released to work
on a modified schedule, "four hours per day, 5 pound lifting limit.
Minimize twisting and bending.  Sitting as needed.  Changing
positions frequently.  No driving a bus at this time." (A.R. 579)

    Wilcox returned to see the physical therapist on April 26,
2001. (R. 310-12)  Wilcox's chief complaints included "low back
and intermittent right leg achiness and the condition is improving,
intermittent in the back, buttock, thigh." (A.R. 310)  Wilcox's
goal was to return to full-time work, and prevent any recurrence.
She stated her symptoms worsened with sitting and bending as the
day progressed.  She was working part-time with restrictions and
modified duties including no repetitive lifting, bending, or
sustained positions, and lifting/carrying limited to five pounds.
(*Id.*)  She was scheduled for "2 visits, in 2 weeks to determine
appropriateness for mechanical therapy.  10 additional visits in 6
additional weeks if responding to treatment." (*Id.*)

20 - FINDINGS AND RECOMMENDATIONS

Wilcox was seen at the OM clinic on April 30, 2001.  She was feeling better, and was released to work six hours per day, but still no bus driving.  (A.R. 578)  On May 11, 2001, she reported continued improvement.  She was released to work eight hours per day, but advised to "avoid driving for an additional week."  (A.R. 577)  On May 21, 2001, she was released "to being on the bus two hours a day for the week of 05/21, four hours/day for the week of 05/28."  (A.R. 576)

Wilcox did well until May 23, 2001, when she went to the OM clinic complaining of an acute lumbar spasm.  She had ridden in a car for work and "noted gradually increasing low back pain just to the right of the diskectomy scar and persisting in the right," with no leg radiation.  (A.R. 575)  She also had some leakage of the bladder.  She had left work early the day before.  When she tried to drive to the clinic, she had to stop due to muscle spasms, so she ended up taking the bus, standing the entire distance of the trip.  When she arrived at the clinic, she asked to lie down.  She was diagnosed with an acute lumbar spasm postoperatively, and she was directed "to be home at bedrest, following her physical therapy appointment [scheduled for the same day]."  (*Id.*)

At physical therapy, Wilcox reported that the day before, she had gotten into and out of a van repeatedly, causing a flare-up of her back and leg pain.  She described her leg pain as "intermittent with extending [her] leg forward while driving or striding out."  (A.R. 306)  Wilcox was instructed in therapeutic techniques, and she left the office "symptom free" in her leg.  She was expected to achieve "full resolution back to previous status in one week."  (*Id.*)

21 - FINDINGS AND RECOMMENDATIONS

1    Wilcox returned to the OM clinic for followup on May 29, 2001.
2    She stated she was "comfortable only when walking about for short
3    periods of time and then lying down, otherwise, she [had] spasm
4    extending to the right and down the right leg and into the right
5    calf." (A.R. 574)  Wilcox stated she had "been extremely depressed
6    at home and frequently very tearful and crying." (*Id.*)  She was
7    advised to follow up with Dr. Gallo.  Notes indicated, "At this
8    time, I do not feel the patient is able to work, as she is
9    uncomfortable being up and around.  I am concerned about the postop
10   status of this individual and may consider discussing with
11   Dr. Gallo for either further imaging or the possibility also of a
12   rehab program, work hardening." (*Id.*)

13   At her physical therapy session on June 1, 2001, Wilcox
14   reported some improvement, but she still had achiness in her leg.
15   She had tried to walk, but reported that "after about 4 blocks the
16   leg pain gets worse." (A.R. 305)  She was instructed to walk for
17   five minutes every two hours, followed by extension exercises.
18   (*Id.*)

19   Wilcox saw Dr. Gallo for followup on June 4, 2001.  She
20   reportedly had been "doing well at light duty until about 2 weeks
21   ago when she had an exacerbation of back pain after getting in and
22   out of a van at work over the course of about 3 hrs." (*Id.*)  She
23   experienced frequent muscle spasms after the incident, and Paul
24   Panum, M.D., her family doctor, took her off work.  Wilcox stated
25   she did not think she could return to work at her current pain
26   level.  Dr. Gallo ordered a repeat MRI, noting if it did not show
27   evidence of recurrent disc herniation, then Dr. Panum would "try to
28   coordinate her occupational issues as it seems it will be quite a

22 - FINDINGS AND RECOMMENDATIONS

1  while before she gets back to her regular job." (*Id.*)  She was
2  given a continued work release until her next evaluation.  (A.R.
3  243)

4      Wilcox returned to physical therapy on June 6, 2001.  She
5  reportedly was doing better since her last visit, but still had
6  occasional achiness in her leg.  (A.R. 303)  The therapist
7  "strongly suspect[ed] derangement [at] L5 that was a D5 and is now
8  a D3." (*Id.*)  By June 12, 2001, Wilcox had been able to increase
9  her walking to sixteen blocks.  She was "feeling better, but
10 sitting [was] still a problem." (A.R. 302)

11     Dr. Gallo saw Wilcox again on June 18, 2001.  She noted
12 Wilcox's repeat MRI showed "a huge right L4/5 disc herniation with
13 nerve root compression and canal stenosis." (A.R. 231; *see* A.R.
14 244)  Wilcox reported ongoing pain, and she requested another
15 discectomy.  The doctor told Wilcox "that if she reherniate[d]
16 again she [would] need arthrodesis." (*Id.*)  Wilcox was given a
17 work release "until next evaluation." (A.R. 245)

18     Wilcox saw the physical therapist on June 21, 2001.  She had
19 reduced her walking and generally, she was "doing better." (A.R.
20 301)  She stated Dr. Gallo "wants to do surgery again," but she did
21 "not want surgery just yet," until she could obtain a second
22 opinion from another surgeon. (*Id.*)  On June 27, 2001, Wilcox
23 reported that she had been walking more over the previous five
24 days, and her right leg was "much better." (A.R. 300)  She
25 reported continued improvement on July 6, 2001, but noted she was
26 "still only tolerating about 5 minutes of sitting before [her] back
27 [went] into spasm." (A.R. 299)  By July 13, 2001, she had
28 increased her walking and home activities.  She felt she was moving

23 - FINDINGS AND RECOMMENDATIONS

1  better with less guarding, but she still could only sit for five
2  minutes at a time.   She felt her leg symptoms were improving.
3  (A.R. 296)

4      On July 13, 2001, Wilcox was seen at the OM clinic for
5  followup of her second herniation.  She was unable to work, or even
6  to sit, stand, or be up and about for any period of time.     An
7  independent medical examination was scheduled, and she was directed
8  to follow up after that examination.   (A.R. 573)

9      Wilcox saw Dr. Purvis on July 13, 2001, for general followup.
10 She reported that she was under ongoing evaluation regarding
11 another herniated disc, and the doctor noted another operation
12 likely was indicated.   (A.R. 378)

13     Wilcox tried physical therapy at the pool again, but reported
14 to the physical therapist on July 20, 2001, that she had been
15 "unable to tolerate the extended position."    (A.R. 298)    The
16 therapist noted Wilcox was "[b]eginning to plateau," and she "may
17 need further intervention." (*Id.*)

18     On July 23, 2001, at the request of SAIF, Wilcox saw David J.
19 Silver, M.D. for a second opinion regarding her course of
20 treatment.   (A.R. 529-30)   He recommended a "[r]epeat micro-
21 diskectomy right L4-5."   (A.R. 530)   Wilcox wanted to delay the
22 surgery until she could lose some weight, but he recommended she go
23 forward with surgery immediately, "given the size of this fragment
24 and her current disability." (*Id.*)

25     Wilcox returned to the OM clinic on July 27, 2001.   She was
26 awaiting approval for a second discectomy.   She currently was
27 unable to work.   (A.R. 570)

28

24 - FINDINGS AND RECOMMENDATIONS

1    When Wilcox saw the physical therapist on July 31, 2001, she
2    reported that she was scheduled for surgery the following week.
3    (A.R. 295)   The therapist noted Wilcox had "shown excellent
4    compliance with self treatment and preventative measures." (*Id.*)

5    Wilcox was seen at the OM clinic on August 3, 2001.  She still
6    had difficulty being up and about, and noted she was scheduled for
7    surgery in the near future.  (A.R. 569)   She underwent a repeat
8    L4/L5 discectomy on August 7, 2001. (A.R. 238-39)  She returned to
9    see the physical therapist on August 15, 2001, stating she had done
10   very well after her surgery until August 14th, when she "turned
11   funny in bed . . . [and] had some sharp pain[.]"  (A.R. 294)  She
12   had improved somewhat since this incident.  She was instructed in
13   proper body mechanics for various movements. (*Id.*)   When she
14   returned on August 28, 2001, she reported "having some leg spasms,"
15   although she was walking three times daily, once for 20 minutes and
16   twice for 10 minutes.  (A.R. 293)

17   Wilcox saw Alexis Norelle, M.D. for followup of her surgery on
18   September 4, 2001.  Her symptoms had improved somewhat, although
19   she continued to report "some pain in the posterior leg and
20   groin[.]" (A.R. 230) Wilcox stated the pain was "more like a cramp
21   than a sharp pain," and it worsened with prolonged standing or
22   sitting.  She was undergoing physical therapy and receiving some
23   benefit from that, and was taking Aleve as needed for pain.  She
24   was directed to continue with the physical therapy. (*Id.*) She was
25   given a work release until her next evaluation.  (A.R. 229)  She
26   saw the physical therapist the same day, and noted she was "having
27   some trouble walking greater than 15 minutes [at] one time," which

28

25 - FINDINGS AND RECOMMENDATIONS

1  caused her legs to "get very achy." (A.R. 292)  She was advised to
2  increase her activity level. (*Id.*)

3      The next day, Wilcox was seen in the emergency room with
4  complaints of "[a]nxiety, tingling and palpitations." (A.R. 386)
5  She was noted to be anxious, and stated her symptoms had been
6  occurring since a death in the family a couple of weeks earlier.
7  The doctor opined that her symptoms were anxiety-related.  He
8  restarted her on an antidepressant, which she recently had
9  discontinued, and also prescribed Xanax for her anxiety. (A.R.
10 387)

11     On September 10, 2001, Wilcox and her husband saw Dr. Purvis.
12 Wilcox was noted to be "distressed, anxious and tearful," and she
13 complained of a "[l]ong list of quality of life issues, mostly
14 related to her recurring back pain, her lack of complete response
15 to back surgery and her long-standing chronic anxiety and
16 depression condition." (A.R. 377)  Dr. Purvis frankly told her
17 that to be free of back pain and joint problems, she would have to
18 "lose about 100 [pounds]." (*Id.*)  He also noted she might need to
19 see a psychiatrist for her depression and chronic anxiety.[2]  The
20 doctor suggested the possibility of gastric plication surgery.
21 (*Id.*)

22     On September 11 and 18, 2001, Wilcox saw the physical
23 therapist and reported gradual improvement.  She could walk for
24 about twenty minutes at a time.  Although her leg pain would
25 increase with walking, it would improve when she stopped.  She also

26

27

28     [2]Wilcox testified she made attempts to try to find a
psychiatrist, but never ended up seeing anyone. (A.R. 701-02)

26 - FINDINGS AND RECOMMENDATIONS

could tolerate sitting for up to twenty minutes at a time.  (A.R. 290-91)

On October 2, 2001, Betty Berry from SAIF Corporation requested job restrictions from the physical therapist.  She listed possible alternate duty assignments including clipping newspaper articles, making photocopies, verifying and proofing documents for "Braille projects," and proofreading bus route snow-and-ice schedules.  (A.R. 286-87)  She asked whether Wilcox "could drive a car to a location and count passengers getting off and on buses." (A.R. 287)  She noted benches were at the bus stops and Wilcox could sit and stand at will.  (*Id.*)  Berry added, on October 3, 2001, that Wilcox's employer was "ready to provide modified work just as soon as she is released."  (A.R. 289)

Berry proposed a job for Wilcox doing "survey work."  The job duties were described as follows: "Employee will be stationed at various locations in the Eugene/Springfield area and will gather & record data.  The heaviest item to be lifted is a clipboard.  This position allows the flexibility to sit, stand and move around as needed."  (A.R. 288; *see* A.R. 289)  The job would require lifting, carrying, pushing, and pulling of one pound occasionally; bending and twisting about 10% of the time; walking on level surfaces occasionally; climbing three to four stairs occasionally; reaching above the shoulder about 15% of the time; frequent, repetitive use of the arms, wrists, and hands; occasional operation of foot controls; and occasional exposure to heat, cold, dust, noise, and the like.  (A.R. 288)

27 - FINDINGS AND RECOMMENDATIONS

1    The physical therapist indicated Wilcox could be released for
2  these job duties beginning October 15, 2001, with the following
3  restrictions:

> Additional specific recommendations:
> (1) should be able to tolerate some survey
> work at one location as long as she does not
> get in and out of an auto several times in a
> shift, [and] changes positions as follows:
> •    no standing [over] 10-15 min @ a time
> •    no sitting [over] 10-15 min @ a time
> •    walking up to 30 min only
> •    lifting up to 10#, no repetitive bending
> •    still has difficulty with stairs on a bus
> (2) Recommend beginning [at] 3 hrs/day for 3
> wks, then 4 hrs/day for 3 wks, then 6 hrs/day
> for 3 wks if continuing to improve.

11  (A.R. 287)

12    Wilcox saw the physical therapist on October 3, 2001, and
13  reported that she was "progressing nicely." (A.R. 285)  She was
14  tolerating more activities slowly and agreed she could return to
15  work with some restrictions. (*Id.*)

16    Wilcox saw Dr. Gallo on October 8, 2001.  She reported "marked
17  improvement over the last couple of weeks." (A.R. 230)  Although
18  she continued to have some back and leg pain, she stated it was
19  much better than before the surgery, and she thought she could go
20  back to light duty work.  Dr. Gallo gave her a work release for
21  light duty work, and directed Wilcox to continue with the physical
22  therapy. (*Id.*)

23    Wilcox next saw the physical therapist on October 18, 2001.
24  She stated she was "doing OK, working 3 hours/day[.]" (A.R. 283)
25  Her leg was "very achy after this shift, but [did] not remain worse
26  for too long." (*Id.*)  On October 23, 2001, she reported that her
27  stamina was increasing slowly.  Her leg continued to be very achy
28  at times.  She was instructed in some new exercises. (A.R. 282)

28 - FINDINGS AND RECOMMENDATIONS

On October 30, 2001, Wilcox stated the new exercises were working well and had not aggravated her symptoms.  (A.R. 281)

Wilcox saw Dr. Purvis on November 6, 2001, for followup of her hypertension.  She had begun exercising and had lost six or seven pounds since her last visit.  (A.R. 377)

When Wilcox saw the physical therapist on November 7, 2001, she reported that she had increased her walking to "50-60 minutes daily."  (A.R. 280)  Her leg pain increased by the end of the walk but did not remain worse.  (*Id.*)  The therapist noted Wilcox was "[r]eady to increase work hours per original recommendation." (*Id.*) She saw the therapist again on November 14, 2001, reporting that she was walking ten to fifteen miles per week.  She was working four hours per day and was tolerating it well, but feeling fatigued.  The therapist noted Wilcox might need to remain at six hours per day of work for four to six weeks before she could increase to eight hours per day.  Her previous restrictions for bending, lifting, and changing positions would need to continue. (A.R. 279)

Wilcox continued to report improvement at her next followup with Dr. Gallo, on November 19, 2001.  She stated her back and leg pain were "much better," and she was able to work light duty for four hours per day.  She planned to return to full-time work "over the next several weeks," and the doctor "anticipate[d] closure at light/medium duty in 2-3 months."  (*Id.*)  She noted Wilcox would have a Physical Capacity Evaluation (PCE) "and inclinometer evaluation" before her case was closed.  (*Id.*)

Wilcox saw Dr. Purvis on November 20, 2001, for followup of her hypertension.  She was noted to be "very anxious" and "very

29 - FINDINGS AND RECOMMENDATIONS

tearful." (A.R. 376)  She talked at length about emotional, physical, and sexual abuse that she had endured from her father, and Dr. Purvis again suggested counseling, to which Wilcox was "quite receptive." (*Id.*)  He recommended a counselor for her to see. (*Id.*)

Wilcox called Dr. Purvis on November 27, 2001, complaining of knee pain.  She wondered if she could have "gout" in her knees.  He advised her to use Ibuprofen until he could see her and obtain a uric acid level. (*Id.*)  When Wilcox next saw the physical therapist, on November 28, 2001, she stated she was "doing fairly well," but she had been experiencing knee pain that was limiting her walking somewhat.  (A.R. 278)

Wilcox saw Dr. Purvis on December 4, 2001, reporting that she was "generally stable and doing well," with "[n]o new complaints or problems at this time."  (A.R. 375)  On December 5, 2001, Wilcox reported to the physical therapist that she had not yet been able to increase her work to six hours per day because "forms [had] not been returned to work yet[.]"  (A.R. 277)  She stated she was "tolerating the activities that [she had] been given [at] work." (*Id.*)

Wilcox was seen in the emergency room on December 16, 2001, complaining of rapid heartbeat.  Her history was noted to be "[s]ignificant for distress and anxiety reactions" and "[h]ypertension." (A.R. 384)  She stated she had been "under a lot of stress lately because of her back surgeries and pain."  She had been unable to work as a bus driver and had learned that day that her employer was filling her position and planning to retrain her for a different position.  An EKG was normal, and the doctor opined

30 - FINDINGS AND RECOMMENDATIONS

1  Wilcox's symptoms were "anxiety provoked." (A.R. 385)  He advised
2  her follow up with Dr. Purvis. (*Id.*)

3       On December 17, 2001, Wilcox told the physical therapist she
4  was having good days and bad days.  She was walking two miles every
5  day and doing her exercises once or twice a day.  She stated, "I am
6  not sure I could tolerate more than 6 hours/day." (A.R. 276)  The
7  therapist planned to have Wilcox begin some "light bending, lifting
8  and carrying activities in the gym, [and] some work simulation."
9  (*Id.*)  By January 3, 2002, she was doing her exercises twice a day,
10 and she had increased her sitting to forty minutes at a time.  Her
11 leg symptoms would begin after one mile of walking.  "[L]eg
12 strengthening exercises in standing [were] easier.  Standing limits
13 remain[ed] at 20 minutes." (A.R. 275)  Notes indicate Wilcox might
14 be ready to increase her lifting weight limit to five pounds. (*Id.*)
15 A PCE was scheduled for February 4, 2002. (*Id.*)

16      Wilcox saw Dr. Purvis on January 15, 2002.  She indicated she
17 had been "under tremendous stress over the past two weeks,
18 [because] all three of her brothers [had] been in crisis of one
19 sort or another and one [had] died." (A.R. 375)  She was not
20 driving a bus, but was doing office work for the bus company.  Her
21 medications were continued without change. (*Id.*)

22      On January 18, 2002, Wilcox reported to the physical therapist
23 that she was "doing pretty well with the work simulation activi-
24 ties[.]" (A.R. 273)  She continued to have right leg pain "with
25 too much activity." (*Id.*)  Notes indicate she was "ready for 10#
26 progression." (*Id.*)  On January 24, 2002, Wilcox reported a "minor
27 flare up from the lifting activities" she had done the previous
28 week, but she was "feeling much better" and was walking over two

31 - FINDINGS AND RECOMMENDATIONS

miles a day.  (A.R. 272)   The therapist planned to increase her
work simulation to twelve-to-fifteen pounds. (*Id.*)  On January 31,
2002, Wilcox reported that she had not had increased symptoms after
her last sessions and she was "doing better."  (A.R. 271)

On February 4, 2002, Wilcox underwent a three-hour Functional
Capacity Evaluation.  (A.R. 261-70)  She tolerated the evaluation
"fairly well," and "demonstrated appropr[i]ate posture and position
changes as needed during the exam as a safety measure."  (A.R. 262)
Her sitting tolerance continued to be limited, and she had
difficulty with stooping and squatting, all of which were noted to
be "required tasks listed in her bus operator job analysis." (*Id.*)
The therapist noted Wilcox's job required "performance at the
Light/Med[ium] physical demand level," while Wilcox "demonstrated
the ability to perform at the Light physical demand level[.]"
(*Id.*)   The FCE results indicated Wilcox could lift and stand
occasionally; walk, sit, carry, kneel, crawl, reach, and handle
frequently; and push or pull constantly. (*Id.*)

Dr. Gallo conducted a detailed closing exam of Wilcox on
February 21, 2002.  (A.R. 227-28)  She noted Wilcox had "done
fairly well with good relief of the severe back and leg pain and
the urinary symptoms she was having prior to her surgeries."  (A.R.
227)  Wilcox continued to report "some mechanical back pa[i]n and
a pulling sensation down the right leg when she [bent] or lift[ed]
too much."  (*Id.*)   The doctor noted Wilcox's PCE put her at the
light duty level, and Wilcox's current job was at the light/medium
duty level.  She noted it was unclear whether Wilcox's employer
could "modify her job in order to accommodate her limitations."
(*Id.*)

32 - FINDINGS AND RECOMMENDATIONS

1    Wilcox's lumbar ranges of motion were assessed using an
2    inclinometer. She demonstrated 15 degrees of extension (with 25
3    degrees being normal), 15 degrees of flexion (with 60 degrees being
4    normal), 23 degrees of left bending and 21 degrees of right bending
5    (with 25 degrees being normal for each side), and left straight-
6    leg-raising of 90 degrees and right straight-leg-raising of 85
7    degrees (with 80 to 90 degrees being normal for each side). (*Id.*)
8    Wilcox's motor exam was normal, with no atrophy or fasciculations
9    noted. Her sensory exam also was normal, with sensation in the
10   soles of her feet intact bilaterally. (*Id.*)    She had somewhat
11   impaired reflexes of her knees and ankles. (A.R. 228)    Dr. Gallo
12   reached the following conclusions from Wilcox's exam:

13              I think the patient is medically stationary at
                this point and capable of light duty work,
14              full-time, with the following permanent
                restrictions: occasional lifting up to 20 lbs,
15              frequent lifting up to 10 lbs, no repetitive
                bending or twisting at the waist, no sitting
16              for over 30 minutes without ability to change
                position. The patient is being returned to
17              her primary care physician for ongoing care.
                I will be happy to see the patient back upon
18              referral as deemed appropriate by her primary
                care physician at any time in the future.
19

20   *Id.*

21    Wilcox was seen at the OM clinic on March 14, 2002, "to review
22   her current status." (A.R. 567)    She stated Dr. Gallo had released
23   her to work with permanent limitations of "occasional lifting up to
24   20 pounds, frequent lifting up to 10, no repetitive bending or
25   twisting and no sitting over 30 minutes without the ability to
26   change position." (A.R. 567)    She also stated the physical
27   therapist had released her to light work, and opined that bus
28   driving would be a light/medium job. The OM clinic opined that

33 - FINDINGS AND RECOMMENDATIONS

Wilcox "should not return to bus driving" due to "significant risk of re-injury of her back should she be in a bus driver position for any prolonged period of time." (*Id.*)

Wilcox saw Dr. Purvis on April 16, 2002.  She stated she was losing her job as a bus driver, and she had applied to SAIF for a vocational evaluation and rehabilitation training.  The doctor opined this was "probably the correct decision as I think bus driving aggravates her back and leg problem." (A.R. 375)  He noted Wilcox's blood pressure would go up whenever she got anxious or upset. (*Id.*)  He further indicated his support for Wilcox's application for disability, indicating it "could be a very positive life experience for her ultimately." (A.R. 374)  He also noted Wilcox was "making diligent effort to increase her exercise and activity level and reduce her calorie intake." (*Id.*)

Wilcox saw Dr. Purvis for followup on August 9, 2002.  Wilcox opined her blood pressure medication was contributing to her anxiety, and was interfering with her ability to exercise.  She and the doctor agreed to try tapering her dose downward.  The downward taper was continued the next month, and the medication was discontinued by her next followup on November 25, 2002. (A.R. 373-74)  Her blood pressures at that time were noted to be excellent. (A.R. 373)  Wilcox stated she was in school, "working on becoming a teacher." (*Id.*)

Wilcox saw Dr. Purvis on March 17, 2003, for followup of her blood pressure.  Notes indicate she was "no longer losing weight actively," and her weight at that time was 261 pounds. (A.R. 373)  They agreed to try a different blood pressure medication because

34 - FINDINGS AND RECOMMENDATIONS

1  the doctor did not feel Wilcox's blood pressure was well
2  controlled. (*Id.*)

3      On April 7, 2003, Wilcox saw Dr. Purvis and reported that she
4  was "generally stable and doing well." (A.R. 372)  She was
5  planning a move to "a much less stressful environment." (*Id.*)  By
6  her next appointment, on July 9, 2003, she had "moved out in the
7  country" and was "raising chickens with 29 in her flock." (A.R.
8  372)  She generally reported "enjoying life, working diligently on
9  weight loss," and her weight was down to 255 pounds. (*Id.*)

10     On October 24, 2003, Wilcox reported to Dr. Purvis that she
11 was still in school, "working hard with her lessons and happy and
12 feeling well about her progress." (A.R. 371)  Her back had
13 "improved considerably with her less active lifestyle," and her
14 blood pressures had been excellent.  She was advised to get more
15 exercise as her weight continued to be a problem. (*Id.*)

16     Wilcox saw Dr. Purvis on January 23, 2004, and reported that
17 she had fallen down at school on January 8, 2004, injuring her left
18 knee.  She had used crutches for a few days but was no longer using
19 them, and her pain was subsiding.  The doctor noted Wilcox's knee
20 appeared intact with no effusion, crepitation, or other problems,
21 and she walked without a limp.  He diagnosed a recent left knee
22 sprain "with improvement." (A.R. 371)  He prescribed Celebrex 100
23 mg twice daily for ten days "to accelerate her recovery." (*Id.*)

24     X-rays of Wilcox's left knee, taken on February 2, 2004,
25 showed "[o]steoarthritic changes . . . in all three compartments,
26 especially severe in the patellofemoral compartment." (A.R. 358)
27 The radiologist's conclusion was "Significant osteoarthritic
28 change." *Id.*

35 - FINDINGS AND RECOMMENDATIONS

1    Wilcox saw Dr. Purvis on February 7, 2004.  She stated she had

2  fallen again and "injured her right knee again[.]"[3]  (A.R. 370)  X-

3  rays had not shown any fracture and her knee was improving.  Notes

4  indicate her blood pressure was "totally unacceptable today" at

5  200/120, and the doctor started her on a different medication.

6  (*Id.*)

7    Wilcox saw Dr. Panum on February 13, 2004.  The doctor noted

8  the following "Interval History of Present Injury":

> [Wilcox] is a patient who is well-known to me
> from a previous back injury, two laminec-
> tomies, and subsequent permanent partial
> disability.  I do not have her old records
> with me at this time.  She states that she has
> been doing reasonably well with having good
> days and bad days, persistent pain into the
> legs, and sometimes having spasms in the left
> leg.  she states that at her last visit with
> Dr. Gallo, she was told that this is as good
> as it gets, that she would have good days and
> bad days, and that she could expect to have
> left leg problems, as well as right leg prob-
> lems.  In September 2003, she made a trip to
> Portland for a relative's wedding and on the
> way back, she had increased pain and dis-
> comfort.  She stopped numerous times to try
> and improve the back situation, doing exer-
> cises as previously recommended by the
> physical therapist.  Her back and legs both
> ached badly on and off throughout the fall of
> 2003, and she had what she felt to be more bad
> days, but she continued to walk one to three
> miles per day, she continued to go to school,
> and she continued to do exercises as she had
> been instructed.  Around the first part of
> December 2003, her left leg began aching badly
> and there were some cold days that she did not
> walk in her neighborhood.  During Christmas
> vacation from school, she started getting her
> crutches out on most days because of spasms in
> the left leg.  She apparently had company over
> Christmas and felt that she was, most of the

---

27    [3]This apparently was a scrivener's error in the doctor's
notes.  Wilcox injured her left knee on both occasions, and x-rays
28  were taken of her left knee, not her right knee.  (*See* A.R. 358)

36 - FINDINGS AND RECOMMENDATIONS

time, immobilized because of the low back pain and spasms in the leg.  She returned to school on January 8, 2004, following a snow delay, and on the first day of her practicum at Meadow View Schools, she followed 29 students out of one door over wet sidewalks and into the door of the hallway that was horizontal and was carpeted.  There was a mat on top to wipe feet.  In the hallway straight ahead the floor was tiled.  All 29 students, she says, walked ahead of her.  She stepped onto the tile floor and down she went.  She feels that this was because her leg had given way.  She says that she has had difficulty with that leg before.  Two weeks ago, approximately two weeks before her visit today, 02/13/04, she said that she fell getting out of her tub at home.  She felt that things had been going well, had no problems, and then suddenly the left leg gave way.  She presents because of increased discomfort in the left leg, and spasms and pain in the left low back.

(A.R. 355)

On examination, the doctor noted Wilcox had decreased reflexes bilaterally.  She had good flexion, extension, and lateral bending, and straight-leg-raising was positive at 90 degrees on the left and negative on the right.  (A.R. 355-56)  Dr. Panum prescribed a short course of physical therapy, which was approved by the workers' compensation carrier.  (A.R. 356)

Wilcox attended physical therapy from February 23 to April 19, 2004.  (*See* A.R. 251-59)  As of April 19, 2004, she reported that she was "much better than . . . when [she] first started, but still having some intermittent [lower extremity] symptoms."  (A.R. 251)  She indicated her exercises were "really helping"; however, she had been unable to return to school for the current quarter "due to the pain when pulling [her] book bag (in a cart with wheels)."  (*Id.*)  The therapist noted Wilcox had been unable to start Phase 2 strengthening and stabilization exercises, although she had

37 - FINDINGS AND RECOMMENDATIONS

improved.    She was advised to "continue with the self treatment
exercises, add lateral compartment tech[nique] as needed and
increased daily walking as long as the [lower extremity] symptoms
continue to reduce." (*Id.*)   Overall, the therapist noted Wilcox was
improving and responding to the current treatment plan. (*Id.*)

On April 26, 2004, Wilcox saw Richard Abraham, M.D. (filling
in for Dr. Panum) for recheck of her back.   She reported that her
four   physical   therapy   sessions   had   helped   her   back   pain
"immensely," and she had "returned to her baseline."   (A.R. 352)
The physical therapist had requested three more sessions, which
were   approved   by   the   doctor.   Wilcox   was   undergoing   vocational
rehabilitation for retraining in a different job, and she was given
a release to return to work. (A.R. 352-53)   She was advised to
continue doing her home exercises.   (A.R. 353)   (This was her last
visit to Dr. Panum's office.   *See* A.R. 391)

On July 29, 2004, Mary Ann Westfall, M.D. reviewed the record
and completed a Residual Physical Functional Capacity Assessment
form.   (A.R. 392-96)   She opined Wilcox could lift up to twenty
pounds occasionally and ten pounds frequently; sit, and stand or
walk, for a total of six hours each in an eight-hour workday, with
normal breaks; push/pull without limitation; occasionally climb
ramps or stairs, stoop, kneel, crouch, and crawl, but never climb
ladders, ropes or scaffolds; and balance frequently.   She opined
Wilcox   would   have   no   manipulative,   visual,   communicative,   or
environmental limitations.   (*Id.*)   On November 23, 2004, Martin
Kehrli, M.D. reviewed the record and concurred in Dr. Westfall's
conclusions.   (A.R. 396)

38 - FINDINGS AND RECOMMENDATIONS

1     Wilcox saw Dr. Purvis for followup on September 3, 2004.  She
2  was noted to be "stable and doing well."  (A.R. 416)  She called
3  the doctor's office on September 10, 2004, stating she had been
4  unable to take a deep breath since noon, and she felt "shaky."
5  (*Id.*)  She was advised to go to the E.R. "or urgent care." (*Id.*)

6     On December 3, 2004, Wilcox saw Dr. Purvis for followup.
7  Notes indicate she had "eaten too much over Thanksgiving and gained
8  several pounds back"; her weight was 256 pounds.  (A.R. 416)  They
9  discussed getting her back into a diet and exercise program. (*Id.*)
10 When she saw Dr. Purvis on March 4, 2005, notes indicate Wilcox had
11 "arthritis in the left knee, which [had] been x-rayed in the past."
12 (A.R. 415)

13    On April 5, 2005, Wilcox saw Dr. Purvis reporting a recent
14 "flare-up of back pain and sciatica down the right leg similar to
15 what was going on about a year ago."  (A.R. 414)  She was using a
16 cane to walk, but seemed to have "adequate muscle function, both
17 extension and flexion of the foot." (*Id.*)  Dr. Purvis prescribed
18 Darvocet N 100. (*Id.*)

19    Wilcox returned to the OM clinic on April 13, 2005, requesting
20 physical therapy.  According to Wilcox, she had been informed that
21 neither Dr. Purvis nor Wilcox's former physical therapist was
22 covered for further occupational therapy by her insurance, and she
23 had been told to see a doctor at the OM clinic.  Only a brief
24 examination was done.  Notes indicate Wilcox was "using a cane in
25 her right hand," and she walked with a limp.  (A.R. 562)  She was
26 diagnosed with chronic sciatica, and directed to follow up with her
27 regular physician.  (A.R. 562-63)

28

39 - FINDINGS AND RECOMMENDATIONS

On May 5, 2005, Wilcox saw rehabilitation specialist K. Annette Weller, M.D., on referral from SAIF Corporation, for Dr. Weller to assume Wilcox's care as attending physician. (A.R. 433; *see* A.R. 433-37)   Wilcox noted she was "two terms away from her associates degree," which she planned to finish "and then go on to get a teaching certificate at the University of Oregon." (A.R. 435)   On examination, Wilcox was noted "to reduce weightbearing on the right leg," and her pain appeared to be "focused to the right sacroiliac region." (*Id.*)   Dr. Weller noted Wilcox had "some persistent findings consistent with a right L5 radiculitis and some dysesthetic pain." (A.R. 437)   She prescribed a course of physical therapy "focusing on developing a program of lumbosacral spinal stabilization and a trial of hydrotherapy." (*Id.; see* A.R. 559-61)   She prescribed a trial of Neurontin for pain, and noted that if Wilcox was not significantly improved in six weeks, a further MRI study should be considered. (*Id.*)

On May 24, 2005, Wilcox was seen by physical therapist Karl Kolbeck for evaluation on referral from Dr. Weller.   Wilcox reported that about two-and-a-half months earlier, she had spent a day or two "helping her husband in the garage holding some items up on the wall," and she awoke in the morning "with limited motion, function and increased pain." (A.R. 465)   The pain was in the central and right lumbar area, and referred into her right leg in the back of the thigh and side of the leg.   She reported that maintaining any position for more than thirty minutes aggravated her pain, as did bending and twisting.   "Light dynamic activity and changes out of static postures [was] relieving." (*Id.*)   She was scheduled for eight weeks of therapy per Dr. Weller's referral.

40 - FINDINGS AND RECOMMENDATIONS

1  (A.R. 466)  She had no new complaints at her session on May 26,
2  2005 (A.R. 464), and on June 1, 2005, she reported her low back was
3  "feeling a lot better already by just using better body mechanics
4  and posture."  (A.R. 463)

5      Wilcox returned to see Dr. Purvis on June 3, 2005.  She was
6  continuing in physical therapy and doing water exercises, and noted
7  she had "definitely improved."  (*Id.*)   Her medications were
8  continued without change.

9      Wilcox saw Dr. Weller for followup on July 1, 2005.  She
10  reported that the physical therapy was proving very helpful, and
11  she rated her pain "as zero."  (A.R. 431)  She stated that over the
12  previous two weeks, she had experienced pain as high as 5/10 in her
13  right leg, posterior calf and thigh, "usually in the evenings."
14  (*Id.*)  She was doing home exercises three times a week and pool
15  exercises twice a week.  She reportedly was sleeping fairly well at
16  night.  Dr. Weller prescribed additional physical therapy and home
17  exercise program. (*Id.; see* A.R. 554-58)

18      Wilcox continued with her physical therapy sessions, receiving
19  treatment on June 8, 10, 15, 17, 22, 24, and 29; July 1, 6, 8, 15,
20  and 29; and August 3 and 10, 2005.  (A.R. 447-61)  She improved
21  with treatment, noting on June 17, 2005, that "she was able to do
22  some light work in garden with several hrs rototiller."  (A.R. 458)
23  She made steady progress, with "overall improvement of 85%" by
24  August 3, 2005.  (A.R. 448)

25      On August 11, 2005, Wilcox told Dr. Weller she was doing much
26  better overall, "with no more radicular symptoms."  (A.R. 480)  She
27  complained of some stiffness in her back in the morning that
28  improved with movement.   At the end of the day, her pain and

41 - FINDINGS AND RECOMMENDATIONS

1  discomfort would increase again, focused primarily in her right low
2  back just above the hip area.  She was continuing with physical
3  therapy once or twice a week, doing pool exercises two to three
4  times a week, and exercising in the gym once or twice a week.  She
5  also continued with her home exercise program.  On examination, her
6  lumbar range of motion was good.  She exhibited some tenderness in
7  the right lower lumbosacral paraspinal region.  The doctor
8  prescribed continued physical therapy for four more weeks. (*Id.*;
9  *see* A.R. 552-53)

10     Wilcox continued her physical therapy, with sessions on August
11  17 and 31, 2005.  (A.R. 445-46)  Although she still complained of
12  "difficulty with maintaining sitting and standing positions for
13  prolonged periods and extended walking" (A.R. 445), she noted she
14  was seeing "improvement in activities that she normally would have
15  difficulty with say a few months ago or even way back at initial
16  injury time period."  (A.R. 446)

17     On September 6, 2005, Wilcox saw Dr. Purvis and reported
18  "feeling well with no complaints, tolerating her medications."
19  (*Id.*)  The doctor indicated Wilcox likely would need an increased
20  dosage of blood pressure medication, which Wilcox was "very
21  resistant to consider."  (A.R. 413)

22     Wilcox saw Dr. Weller on September 27, 2005.  She reported
23  some increased pain the previous week "after walking and standing
24  on concrete to do some canning activities in her home." (A.R. 429)
25  The pain improved when she laid down.  She was using Darvocet only
26  rarely.  She had taken some time off from school after her most
27  recent injury, but planned to start classes again in the winter
28  term.  Dr. Weller noted Wilcox "continue[d] to have weak spinal

42 - FINDINGS AND RECOMMENDATIONS

stabilizers," and indicated she would benefit from additional physical therapy focused on spinal stabilization, strengthening, and self-management.  She prescribed treatment for another four to six weeks. (*Id.*)

Wilcox had physical therapy sessions on September 7, 14, 21, and 28; and October 7, 12, and 19, 2005.  (A.R. 438-44)  She reported some ongoing bowel and bladder problems that she stated had been present ever since her accident.  Exercises improved her symptoms somewhat, but problems continued to persist at times. According to Wilcox, her physician knew about the problem and had told her "that's as good as she [would] get."  (A.R. 443)  On October 7, 2005, she reported walking at the mall with a friend when she felt her left knee "'jerk' and her back tweek."  (A.R. 440)  She complained of lower back pain and knee pain.  The physical therapist, as well as the PT director, agreed that her knee problem "appear[ed] to be a lax [posterior cruciate ligament] PCL."  (*Id.*)  They directed Wilcox to contact her primary care physician "as she would benefit from a brace to prevent hyperextension." (*Id.*)  On October 12, 2005, Wilcox was noted to be using a cane to walk because she stated her knee wanted to hyperextend.  Her low back, however, was doing much better.  Wilcox was unable to complete her exercise program at the session due to high blood pressure.  (A.R. 439)

On October 19, 2005, Wilcox stated the physical therapy sessions and exercises had "definitely helped increase her strength and endurance."  (A.R. 438)  She stated her left knee would "fold[] on her som[e]times." (*Id.*)  She related her current knee problem to her 2003 accident, opining that other health care providers had

43 - FINDINGS AND RECOMMENDATIONS

overlooked it, "thinking it was related to her back." (*Id.*)  Notes
indicate Wilcox had improved range of motion of her lumbar spine,
increased strength, and was doing well with her home exercise
program. (*Id.*)

When Wilcox saw Dr. Weller on October 25, 2005, she complained
of intermittent left knee pain, and occasional hyperextension of
her knee that would cause increased low back pain and knee pain.
The pain usually would improve after several days of rest.
According to Wilcox, the physical therapist had some concern "about
ligamentous laxity at the knee and . . . suggested use of a knee
splint." (A.R. 427)  Wilcox had no current knee or back pain, and
she continued to do home exercises.  Dr. Weller suggested Wilcox
might benefit from a neoprene sleeve on her left knee, but she
noted that because of Wilcox's "build she would need a custom
fabricated neoprene sleeve in order for it to be effective and
tolerable." (A.R. 428; *see* A.R. 532-33)  She recommended Wilcox
use the sleeve "especially during any walking activities to provide
additional proprioceptive feedback and reduce further injury."
(*Id.*)

Wilcox saw Dr. Weller on December 22, 2005, complaining of
increased left knee pain.  Wilcox stated this was "typical for her
. . . in the winter months [when] her pain seems to be a lot
worse." (A.R. 425)  She stated her pain had increased with the
onset of cold, rainy weather.  She described pain "in right greater
than left low back, where she [had] an aching burning discomfort,"
and "aching over the bilateral anterolateral thigh and numbness and
tingling traveling into the anterolateral lower legs . . . [with]
some intermittent tingling in the left third toe." (*Id.*)  Wilcox

44 - FINDINGS AND RECOMMENDATIONS

stated she would like to return to school to finish the two terms remaining for her associate's degree.  She had stopped school "two years ago after a fall with the left leg giving out and aggravation of her injury." (*Id.*)  She was taking Darvocet and Advil 400 mg as needed.  She continued to do her home exercise program every day. She agreed to a trial of a Lidoderm patch to help with pain management. (*Id.*)

On January 9, 2006, Wilcox saw Leslie Mehlhaff, M.D. to establish a new primary care physician because Dr. Purvis was no longer approved by Wilcox's insurance company.  Wilcox reported that her "main issue has been hypertension, but also a history of gout, seasonal allergies, migraines and anxiety." (A.R. 472)  A regimen was established to monitor her blood pressure.  She returned on February 1, 2006, for followup.  Notes indicate Wilcox was "suffering with a lot more back pain now than previously," and she was under Dr. Weller's care for her back pain.  (A.R. 471)

Wilcox also saw Dr. Weller on February 1, 2006, reporting increasing back pain.  She indicated she was "having difficulty even just standing and bearing weight very well through her right leg." (A.R. 423)  Her pain was "focused in the right low back and buttock, with quite a bit of frequent muscle spasms and palpable knots in the right buttock region, posterior thigh, and just past the knee into the anterolateral lower leg." (*Id.*)  She also had numbness and tingling over the right lateral leg if she sat for more than ten or fifteen minutes at a time.  Lidoderm patches had been helping her sleep.  On examination, the doctor noted reduced muscle strength in Wilcox's ankles, and diminished muscle stretch reflexes in the bilateral lower extremities.  She also exhibited

45 - FINDINGS AND RECOMMENDATIONS

1  diminished sensation to pinprick along the right anterior, medial,

2  and lateral thigh and the anterior and lateral lower leg. (*Id.*)

3  Dr. Weller continued the Lidoderm patch, prescribed Flexeril, and

4  prescribed physical therapy for six weeks. (*Id.*)

5       On February 6, 2006, Wilcox saw a physical therapist for a

6  flare-up of significant pain in her back with right lower extremity

7  symptoms "including pain, ache and some parasthesias." (A.R. 410)

8  The therapist noted Wilcox was "currently disabled." (*Id.*)  Wilcox

9  stated her current symptoms were causing her difficulty with

10 "walking, work, personal cares, sleeping, dressing and sitting."

11 (*Id.*)  She was scheduled for a course of treatment over the next

12 six weeks including:

13          soft tissue mobilization, joint mobilization
            and muscle energy techniques, Therapeutic
14          exercise including - stabilization exercises,
            exercise to strengthen postural musculature,
15          exercise to accelerate healing process and
            aquatic exercises, Home Exercise Program (HEP)
16          consisting of strengthening/stabilization
            exercises, pool therapy and Modalities
17          including - ultrasound to and interferential
            to decrease inflammation and decrease pain.

18

19 (A.R. 411)  Wilcox responded well, although slowly, to the pool

20 therapy. (A.R. 406-09)  By February 27, 2006, she reportedly was

21 "about 50-60% back to previous level." (A.R. 405)

22      On March 14, 2006, Wilcox saw Dr. Weller for followup.  She

23 stated physical therapy had been very helpful in reducing her pain.

24 She indicated she would have frequent, intermittent pain during the

25 day if she did any type of standing activities, such as doing

26 dishes or cooking.  The pain often was relieved if she could lie

27 down and rest fairly soon after onset of the pain, but if she

28 continued activity once the pain had started, she would have a more

46 - FINDINGS AND RECOMMENDATIONS

1   significant flare-up of symptoms.  Her medications were continued

2   without change, and she was directed to continue with physical

3   therapy for six more weeks.  (A.R. 421)

4       When Wilcox's course of physical therapy ended on April 17,

5   2006 (*see* A.R. 534-50), Wilcox rated her overall improvement at

6   8/10.  She still had some pain, but was comfortable continuing with

7   her home exercises.  She was able to sit for one to two hours at a

8   time in an "appropriate chair," and she could "perform all

9   housework if paced."  (A.R. 399)

10      Wilcox saw Dr. Mehlhaff on May 12, 2006, for biopsy of a

11  lesion on her left upper posterior arm.  She had been unable to

12  tolerate Lipitor "due to severe muscle achiness," and she stated

13  that although she was going to the gym twice a day, exercising made

14  her feel tired.  (A.R. 470)  She had "decreased the amount of

15  walking she [was] doing due to her sense of instability." (*Id.*)

16  She expressed a desire to see a counselor, noting she felt

17  "depressed about her health issues and lack of ability to do the

18  things that she want[ed] to do." (*Id.*)  She was referred to a

19  counselor.  (A.R. 469)

20      On August 7, 2006, Dr. Weller wrote an opinion letter to

21  Wilcox's attorney regarding her care of Wilcox.  Dr. Weller stated

22  that due to Wilcox's "lumbar disc condition, she has limited

23  ability to tolerate sitting . . . [and] also limited tolerance for

24  standing activities."  (A.R. 477)  The doctor offered the following

25  opinion of Wilcox's work-related abilities and impairments:

26          It is my opinion that [Wilcox] is not able to
            perform any sustainable work activity, even
27          light activity.  My understanding is that
            light work can require a good deal of walking
28          or standing activity, which would lead to

47 - FINDINGS AND RECOMMENDATIONS

flareups of the patient's low back and right
leg pain, such that she would not be able to
perform this work on a sustainable basis.  In
addition, because of her disc condition, she
would not be able to tolerate sustained
periods of sitting required for a sedentary
job.  With her back condition, she requires
frequent changes in position, alternating
between sitting and standing and occasionally
lying supine.

During the course of the past year and a half
that I have been providing treatment to
[Wilcox], she has been experiencing flareups
of her pain primarily in the winter months.
She was attending classes at LCC but was
limited in this by her limited sitting
tolerance and walking ability.  She has had
significant flareups of radiculopathy with
associated right leg weakness but more
typically demonstrates good strength in both
legs, primarily sensory radicular complaints.

It is my opinion that [Wilcox's] medically
determinable impairments are due to her low
back condition with the L4-5 disc herniation
and disc degeneration is sufficiently severe
that she would be unable to maintain a regular
work schedule and would miss more than two
days a month due to flareups of pain.

In addition to the lumbar disc condition,
[Wilcox's] other medical conditions, including
poorly controlled hypertension, also con-
tribute to her disability.

(A.R. 477-78)

Wilcox saw Dr. Mehlhaff on August 17, 2006, for followup of her hypertension.  She noted that she was unable to walk on some days due to her back pain.  The doctor "gave her a back book today and encouraged her to concentrate on the right ways and wrong ways to do the exercises, etc."  (A.R. 667)

On October 4, 2006, Wilcox underwent a psychodiagnostic examination by Pamela Joffe, Ph.D. at the request of the Oregon Department of Human Services.  Dr. Joffe administered several diagnostic tests and conducted a thorough interview.  Wilcox

48 - FINDINGS AND RECOMMENDATIONS

provided the following description of her activities of daily living:

> [Wilcox] gets up at varying times.  If she can be asleep by 11:00 p.m., she gets up at 7:30 a.m.   If she can't fall asleep until 3:00 or 4:00 a.m., she might sleep in until 9:30 a.m.  In the mornings, she cleans her house.  During the day, she tries to walk one mile and also reads or does laundry.  In the evenings, she and her husband have dinner together and watch T.V.  She goes to bed anywhere between 11:00 p.m. and 3:00 or 4:00 am.  She lies down for a period of time but then has to get up and walk to relieve her pain.  She has been putting on a pain patch . . . at 10:00 p.m. and taking it off at 10:00 a.m., which reduces her level of pain and allows her to sleep.  The Flexeril also helps decrease her muscle spasms, so she can sometimes sleep up to four hours in a row. Her doctor wants her to lie down for at least eight hours each night.

> She and her husband prepare meals.  She only bakes things now so that she doesn't have to stand as long in the kitchen.  She showers every other day.

> Her hobbies include reading, walking and bird watching.  On good days, she can walk a mile loop around her house.  The other days, she walks to the end of the block and back. She has friends on whom she can count.

> Most days, she is able to drive, and she does have a valid driver's license.  She drove to today's appointment.  She uses the bus occasionally, as well.

> She is also [able] to shop on her own only occasionally because she is in more pain when she walks on concrete floors.  She does two loads of laundry every other day.

> She had been attending Northwest Faith Center but has difficulty sitting for long, and after a remodel at the church, there is no place for her to stand during services.  She last attended there six months ago.

> She uses a computer at home for about 15 minutes per day and is independent in her use

1          of the phone.   She and her husband manage
           their own money and are not in debt.
2

3  (A.R. 482-83)

4      For her present complaints, Wilcox stated she

5          has to lie down to rest her back frequently.
           She can sit for only 30-45 minutes at a time
6          and can stand for only 30-45 minutes at a
           time, and then she must either lie down or
7          walk to relieve the pain in her back and legs.
           This has been a problem since the year 2000,
8          when she was hurt in a bus accident.   When
           asked to rate her pain on a scale of 1-10,
9          with 10 being the most severe, [she] said she
           would be at a level 8 during the assessment,
10         as she had to walk up the stairs to get to the
           appointment.  Lying down to relax her back and
11         legs reduces her pain and [there] are periods
           of time early in the day when she can be
12         briefly pain-free.   During the day, however,
           her pain builds up again.  She said she can no
13         longer push herself, and this is difficult
           because she has always been the kind of person
14         who has pushed herself.

15 (A.R. 483) Dr. Joffe observed that Wilcox demonstrated "[q]uite a

16 bit of pain behavior" during the interview, moving around on the

17 couch, and moving pillows during the interview to relieve her pain.

18 (*Id.*)

19     Wilcox stated that since her accident, she had become more

20 depressed and hopeless.  She had planned to continue driving a bus

21 until retirement, and then to retire and travel with her husband.

22 (*Id.*)   She feels sad much of the time, has difficulty making

23 decisions and concentrating, and is more irritable and more easily

24 fatigued than she used to be.   Her score on the Beck Depression

25 Inventory indicated mild depression.   (A.R. 484)   Dr. Joffe's

26 diagnostic impressions included, for Axis I, "Mood Disorder

27 (Depression) Due to General Medical Condition (Back and Leg Pain),"

28 and for Axis IV, Psychosocial Stressors, "Debilitating physical

50 - FINDINGS AND RECOMMENDATIONS

symptoms, unemployed, financial stresses at home, decrease in ability to walk and sit." (A.R. 484-85)  She estimated Wilcox's Global Assessment of Function (GAF) at 50, indicating "[s]erious impairment in physical and occupational functioning." (A.R. 485)

Dr. Joffe reached the following conclusions regarding Wilcox's psychosocial abilities:

> [Wilcox] was able to understand and remember instructions during the interview. She appears to be a bright person who has had a good work history in the past.  She also appears to be able to understand and remember more compli-cated instructions.
>
> In terms of her ability to maintain concen-tration and attention, [she] scored in the low average range on the digit Span subtest.  She had no difficulty adding 3 to numbers and could recall two out of three unrelated items after three minutes.  She could spell the word "world" correctly forwards and backwards.
>
> It is likely that her physical symptoms inter-fere with her ability to maintain attention and concentration for extended periods of time.  She said she must wait everyday to see how her back feels and how she walks in order to make plans for that day.  She fears not having control of her body, feels "down" and has difficulty maintaining a positive atti-tude.  There are some days she feels confused, especially when taking pain medications several days in a row.  If she overextends herself, she must wait several days before she can "get my back and legs settled down again." She could not be expected to maintain a regular schedule, given her physical condi-tion.
>
> Interpersonally, [she] describes no diffi-culty, and she has contact with her family and friends.  She describes no history of problems interacting appropriately in the work setting or with accepting instructions or criticisms from supervisors.  Her behavior appears to be socially acceptable and she was neat and clean.
>
> In terms of adaptive skills, she has good communication skills.  Her self-care and home-

1                living skills are diminished somewhat by her

2                physical complaints.  For example, on days
when she has more pain, she is less able to

3                care for herself and her home.  She showers
every other day, is able to do some

4                housecleaning and does laundry as needed.  Her
son has moved in with her to provide assis-

5                tance.  She is using community resources in
the form of her physician at this time.

6                She has been unable to attend church for the
past six months, as she can't stand during

7                services. Her leisure activities include some
embroidery, making Barbie clothes for her

8                grandchildren, reading and spending time with
friends.  She does not appear to be a danger

9                to her own health or safety at this time.

10  (A.R. 485-86)

11     On October 16, 2006, Wilcox saw Kurt Brewster, M.D. for a

12  consultative orthopedic examination at the request of the state

13  agency. (A.R. 491-506)  Wilcox was noted to be cooperative and to

14  give a satisfactory effort during the examination process, although

15  her responses were noted to be "sometimes vague regarding some

16  symptoms including description of radiculopathy."[4]  (A.R. 491)

17     Regarding her activities of daily living, Wilcox stated her

18  son and brother had to help her dress most of the time.

19  She estimated she could reach above her head 75% of the time, and

20  could pick up something she had dropped 25% of the time.  She could

21  pick up a can of soup, telephone book, and gallon of milk, but

22  could not pick up a one-year-old "(avg. 22 pounds)."  (A.R. 500)

23

24

25     [4]At Wilcox's third hearing, the ALJ stated, "[T]he report of
Dr. Brewster can be certainly read in a way that says this lady is

26  either exaggerating or she's not as bad as she says she is[.]"
(A.R. 743)  Other than Dr. Brewster's notation that Wilcox was

27  "sometimes vague regarding some symptoms including description of
radiculopathy" (A.R. 491), the court has located nothing in

28  Dr. Brewster's report that suggests Wilcox was either "exaggerating
or . . . not as bad as she says she is."

1    She estimated she usually stood for three total hours in a day,
2    walked for two hours a day, and spent two hours watching
3    television, and one hour reading each day.  She exercised three
4    times a week with "30 minutes of stretching [and] swimming." (*Id.*)
5    She estimated she spent two hours a day doing housework, but she
6    could not do any sweeping or vacuuming. (*Id.*)

7        The doctor observed that Wilcox walked "with a slight limp on
8    the right." (A.R. 501)  He observed no obvious muscle spasms in
9    her back, and she was able to sit on the table without changing
10   position for ten minutes.  She got onto and off of the table
11   without difficulty.  Wilcox's physical symptoms were noted to be
12   "variable throughout this and prior exams," with pain radiating
13   first to one leg, then the other, and then to both legs (which the
14   doctor described as "migratory left and right symptoms").  (A.R.
15   504)  His overall findings indicated Wilcox had "mild restrictions
16   walking, standing, as well as frequent restrictions on stooping,
17   given history of previous surgery without success." (*Id.*)

18       He obtained x-rays of Wilcox's lumbar spine that showed
19   "Moderately severe degenerative disc disease" at L4-5, and
20   "Moderate osteoarthritis particularly involving the facets from L4
21   caudally." (A.R. 505)

22       Following his examination of Wilcox, Dr. Brewster completed a
23   Medical Source Statement of Ability to do Work-Related Activities
24   (Physical).  He opined Wilcox would be able to lift/carry twenty
25   pounds occasionally and ten pounds frequently; stand and/or walk
26   for about six hours in an eight-hour workday; sit without
27   limitation; push/pull occasionally; and perform all postural
28   activities frequently.  He also opined she would be able to reach

53 - FINDINGS AND RECOMMENDATIONS

frequently, and perform handling, fingering, and feeling activities without limitation.  He found her to have no visual/communicative or environmental limitations.  (A.R. 487-90)[5]

On November 30, 2006, Dorothy Anderson, Ph.D. reviewed the record and completed a Mental Residual Functional Capacity Assessment form (A.R. 507-09), and a Psychiatric Review Technique form (A.R. 511-24).  She opined Wilcox would be moderately limited in her ability to carry out detail instructions, and maintain attention and concentration for extended periods, but she would have no other limitations in her work-related mental abilities. (A.R. 507-09; *see* A.R. 524)  Her limitations would result from her "focus on her physical problems, concerns and pain," which Dr. Anderson opined would limit Wilcox's "ability to attend and concentrate on more complex and detailed tasks," but would not disrupt her from simpler tasks. (A.R. 509)  She indicated Wilcox's pace and schedule would not be impacted by her mild psychiatric factors or depression. (*Id.*)

Wilcox saw Martin L. Jones, M.D. on January 31, 2007, for followup of her hypertension and hyperlipidemia.  Regarding her activity level, she noted she generally would get up and walk

---

[5]The court notes that Wilcox has expressed concerns about Dr. Brewster's "manner" and "behaviors [that] were unprofessional." (A.R. 755; *see* A.R. 726-28)  At the ALJ hearing, her attorney implied that the ALJ should take Wilcox's concerns into account in his consideration of the report. (*Id.*)
Counsel also expressed some concern that Dr. Brewster had seen Wilcox immediately after her accident in May 2000, and implied that the doctor therefore was an inappropriate choice for this consultative examination. (A.R. 753-55)  The court finds no indication in the doctor's report that he remembered Wilcox from seeing her six years previously, and his findings were unaffected by that fact.

1    around for about thirty minutes, and then have to go back and rest
2    for about thirty minutes.  (A.R. 664)

3         Wilcox saw Dr. Weller on February 6, 2007, reporting "recent
4    flareup of pain that [was] worse than she [had] had all year."
5    (A.R. 621; *see* A.R. 731-32, where Wilcox testified about the
6    flareup of muscle pain)  Notes indicate Dr. Weller had last seen
7    Wilcox on March 14, 2006.  Wilcox reported frequent flareups of
8    significant pain over the previous year, typically lasting three to
9    four days.  She was still exercising at home every day, except when
10   her pain was more severe, and she also tried to walk a mile a day
11   whenever she was able.  She continued to use Flexeril and Lidocaine
12   patches, both of which were helpful. (*Id.*)  Dr. Weller prescribed
13   a course of six sessions of physical therapy "to include some joint
14   mobilization and soft tissue mobilization, as well as reviewing and
15   updating a home exercise program."  (A.R. 622)

16        Wilcox attended physical therapy sessions on February 14, 21,
17   23 and 27, and March 1, 5, and 7, 2007.  (A.R. 613-20)  She
18   improved rapidly, except for one incident when she got chilled and
19   her back tightened up, and by the last session, she had returned to
20   her baseline level. (*Id.*)

21

22   **B.   *Summary of Vocational Evidence***

23        All of Wilcox's past relevant work was driving a bus,
24   including driving for a charter company, a school bus, and a city
25   bus. (*See* A.R. 14350)  Based on Wilcox's Disability Report-Adult,
26   completed at the time she applied for DI benefits (A.R. 122-29),
27   and a telephone interview with Wilcox's last employer (A.R. 112-
28   13), the Social Security office recommended an onset date of

55 - FINDINGS AND RECOMMENDATIONS

February 9, 2002, rather than Wilcox's alleged onset date of May 3, 2000.   As explanation for the recommendation, the Field Office noted the following:

> Claimant returned to work at the [substantial gainful activity] level after her injury from 10/2000 - 03/2001.  She was earning $16.05/hr, working 5 days/wk.  She was off work again, then returned in 6/2001 - 9/2001 working ap[p]roximately 4-6 hrs/day at the same rate of pay.  She increased her working hours from 11/2001 through 2/8/2002 to 4-8 hrs/day at the same rate of pay.  The claimant did indicate that special work conditions existed in her workplace so that she could continue working.  Her employer agreed on the work activity questionnaire indicating that a 60% subsidy was provided to the claimant which began on her injury date and continued until her employment ended on 2/8/2002.  The claimant indicated . . . that her work ended due to her disability.  It appears that the claimant was working at the SGA level through 2/8/2002 even after considering the 60% subsidy provided by the employer.

(A.R. 130-31; *see* A.R. 112-13)

In late February 2007, Wilcox sought retraining assistance from Vocational Rehabilitation Services (Voc Rehab).  She completed a Personal Information Form listing the following employment history:

- 1988-1990 - bus driver for Pacific Rim Coaches.  She left because with children at home, she wanted some consistency to her schedule.
- 09/89 to 06/90 - substitute School Bus Driver for Creswell School District.  She left when she got a full-time position at Mayflower in Eugene, Oregon.
- 08/90 to 06/95 - School Bus Driver at Mayflower/Laidlaw.  She left when she got a better job.
- 06/95 to 02/02 - Bus Driver for Lane Transit District.

56 - FINDINGS AND RECOMMENDATIONS

(A.R. 654-55)  Wilcox asked Voc Rehab to help her get another job by providing her with training, equipment, and "knowledge of what's available." (A.R. 651)  She was noted to have high confidence in her abilities, but not to feel independence.  She was receiving physical therapy to build her physical tolerances. (*Id.*)

In her Functional Capacity Self-Assessment, Wilcox stated she could never bend, squat, crawl, climb, or lift/carry over 20 pounds.  She indicated she could reach above shoulder level occasionally, and lift/carry up to ten pounds frequently and twenty pounds occasionally.  She could use her hands for all types of repetitive movements, but could not use her feet for repetitive movements such as operating foot controls.  She stated she was restricted in connection with all environmental hazards (changes in temperature and humidity; exposure to dust, fumes, and gases. (A.R. 650)  She commented that she is unable to climb ladders or steps; she moves slowly; cold makes her back hurt; she has chronic bronchitis/asthma; and per SAIF instructions, she could not do driving or deliveries. (*Id.*)

The Voc Rehab interviewer noted the following about what Wilcox wanted to gain from Voc Rehab services:

> This pleasant 51 year old woman seeks VR assistance to determine what she can do to work within limitations.  She is 2 terms short of an AA degree in Early Childhood Education. She wants to continue to work in public service, as she did when a driver.  She enjoys helping people, 'I felt good helping people travel on the bus.'  Children are drawn to her.  She enjoys working on a computer and took several LCC classes; CS 120 and Intro to Computers.  She drives a car [for] transportation.

1  (A.R. 647)   The evaluator noted Wilcox might "benefit from LILA

2  Disability Management Workshop," and she likely would "need [an]

3  ergonomic workstation." (*Id.*)

4      Wilcox participated in several workshops at Voc Rehab.  (A.R.

5  639, 641-42)  On May 7, 2007, a Voc Rehab counselor wrote Wilcox a

6  letter stating they had been unable to determine her eligibility

7  for services because they lacked medical records regarding her

8  disability.   (A.R. 637)   Wilcox participated in a couple more

9  workshops.  (A.R. 634-35)  On June 5, 2007, Voc Rehab "determined

10 that this individual require[d] and [could] benefit from VR

11 services to prepare for, enter into, engage in, or retain gainful

12 employment."  (A.R. 631-32)  Notes indicate Wilcox would require

13 flexible hours and an ergonomic workstation. (*Id.*)  Wilcox partici-

14 pated in Voc Rehab training and workshops on May 9 and 30, and June

15 6 and 13, 2007.  (A.R. 627-28)  She became "interested in a work

16 evaluation at LILA [which would] give her information about

17 physical capacities to perform clerical work."  (A.R. 627)   A

18 couple of possible jobs were discussed, but Wilcox's limitations

19 prevented her from working in either of them.  (A.R. 623-24, 627)

20 Wilcox expressed interest in completing her "AA in teaching at LCC

21 and to get a teacher aide or substitute job."  (A.R. 623)

22     At Wilcox's ALJ hearing on March 13, 2007, Vocational Expert

23 ("VE") Lynn Jones testified that Wilcox's past relevant work as a

24 bus driver was at the medium exertion level, and was semi-skilled.

25 (A.R. 746)   The ALJ asked the VE the following hypothetical

26 question:

27              Okay I've already made a reference to
              this.   There are some opinions on limited
28              range of light work and then there's another

58 - FINDINGS AND RECOMMENDATIONS

opinion of no work so let me just give you the
one that's, opines that work can be performed.
Currently we're dealing with an individual
who's 51 years of age, a high school graduate
with this past job. Now everybody indicates
that job can't be performed so that's the end
of, there's no question with that. From an
exertional standpoint I want you to assume
that we're dealing with an individual who has,
is limited to light work in regarding carrying
and lifting 20 pounds maximum, ten pounds
frequently, pushing and pulling, again limited
by those weights. Standing and walking, they
indicated that standing and walking would be
about six hours in an eight-hour workday.
Sitting would be about the same. Some opinion
here indicates there's no limitation on
sitting but I'm going to limit it to about six
hours in an eight-hour workday. There's
limited to only occasional reaching overhead.
With this type of, the type of orthopedic
question involved I want you to look at occu-
pations that don't involve repetitious bending
and lifting from waist to floor level and
earlier I made reference to some change of
position, what we refer to is the sit/stand
option in occupations. So within the maximums
I've given you the individuals should have an
ability to change position throughout the
workday from sitting, from sitting to standing
and walking and from standing and walking to
sitting. In a non-exertional standpoint the
only, there is some difficulty in attending
and concentrating on complex and detailed
tasks but simple, more simple repetitive tasks
should be capable of being performed according
to the non-exertional limitation assessment
here. All right and again one of the key
question[s] of course is going to be sustain-
ability so first off I want you to assume that
we're talking about an individual who could
perform these limitations on a sustained basis
in a normal competitive work setting with the
normal expectations of time, attendance, break
schedules, etcetera. All right so past work
obviously is out. What about other
occupations that you might consider feasible?

(A.R. 746-48)

The VE gave examples including small product assembly, parking

lot cashier, and table worker, all of which are unskilled jobs at

the light exertional level. (A.R. 748, 750) The VE stated all of

59 - FINDINGS AND RECOMMENDATIONS

1  these jobs include a sit/stand option, possibly with some walking
2  but "not a main issue." (A.R. 749)  The jobs also would involve a
3  maximum of twenty pounds of lifting. (*Id.; see* A.R. 750)

4      In response to questions from Wilcox's attorney, the VE
5  indicated that if the individual were required to lie down for a
6  total of about three hours in an eight-hour workday, the individual
7  would be unemployable. (A.R. 748-49)  Similarly, if the
8  individually periodically needed to take a hot bath for thirty
9  minutes at unpredictable intervals, she would be unable to work.
10 (A.R. 751-52)  None of the listed jobs would allow unscheduled
11 breaks of thirty minutes at a time for exercise, nor would they
12 allow 75-minute breaks for aquatic therapy. (A.R. 752)  The VE
13 indicated that if someone were absent chronically for two or more
14 days per month, the individual would not be employable compe-
15 titively. (*Id.*)

16

17 *C.  Wilcox's testimony*

18      *1.  Pain Questionnaire*

19      On June 20, 2004, Wilcox completed a pain questionnaire.  She
20 indicated her pain is "burning, aching, not stinging," and it is
21 located in her "lower back, both sides of L4-5 . . . left leg,
22 knee." (A.R. 151)  The pain lasts from ten minutes to hours at a
23 time, and she has pain daily.  Sitting, standing, and walking for
24 more than 30 minutes causes her pain, and the pain will worsen if
25 she stays in a static position.  Changing position, hot/cold packs,
26 mild exercise, and the "passage of time" make the pain better.
27 (*Id.*)  She takes Naprosyn, Ibuprofen, Aspirin, and Doxepin for her
28 pain, and Flexeril for muscle spasms. (A.R. 151-52)  The medica-

60 - FINDINGS AND RECOMMENDATIONS

tions cause her to be lethargic and "drugged feeling," and she thinks they cause her to have an "abnormal sleep pattern." (A.R. 152)

At the time she completed the questionnaire, Wilcox was able to be up and active for one-half hour before needing to rest. She was unable to complete tasks such as washing dishes, folding clothes, and doing laundry, all at once if the tasks took longer than one-half hour. She stated she used to enjoy hiking, shopping with friends, gardening, and playing with her grandchildren, but she could not do these things any longer. (*Id.*)

Wilcox indicated she needed assistance with her personal grooming, including clipping her toenails and "rubbing dry skin on feet." (A.R. 153) She needed help with all household chores "below waist level, sweeping, . . . [a]nd vacuuming." (*Id.*) She could prepare her own meals, but friends also cooked for her. She visited friends occasionally, but could only engage in hobbies or pastimes for one-half hour before resting. (*Id.*)

### *2. Activities of Daily Living and Socialization*

Wilcox also completed an Activities of Daily Living and Socialization form on June 20, 2004. (A.R. 154-60) She stated that several days a week, she needed help putting on her shoes and pants because she could not bend over. (A.R. 154) She prepared her own meals about three days per week, with less than one-half hour preparation time. Her eating habits had changed since her injury because she was on a "restricted diet due to decreased exercise. Hypertension was previously controlled with exercise." (A.R. 155) She also had "fewer large family dinners." (*Id.*)

61 - FINDINGS AND RECOMMENDATIONS

1   She stated she could do "limited laundry and kitchen cleaning,

2   no bending and less than 1/2 hour standing." She hired someone to

3   clean the floors and bathrooms each week, and her husband did the

4   rest of the housework. (*Id.*) Before her accident, she was "a very

5   energetic cleaner." She stated her husband used to call her the

6   "White Tornado." (A.R. 156)

7   Wilcox indicated she handled the household finances and paid

8   the bills. She planned and did most of the grocery shopping, but

9   she had to know what she wanted, "go get it, pay for items and

10  leave." (*Id.*) She stated, "Browsing is out of the question.

11  Standing on cement floors kills me." (*Id.*) As a result, she no

12  longer could do "comparison shopping and bargain chasing. [She]

13  used to enjoy shopping with friends but [she] no longer can handle

14  lengthy outings." (*Id.*)

15  Wilcox stated she had lost some of her ability to concentrate

16  and to retain what she reads. She watched four to five hours of

17  television per day. Before her injury, she only watched a maximum

18  of two hours per day because she "was busy all the time" and

19  "didn't have time to waste on T.V. then." (A.R. 157) She usually

20  read about four hours per week, and worked on genealogy about an

21  hour per week. She could only shop for up to thirty minutes at a

22  time. She "used to sew but [was] unable to sit bent over the

23  machine now." (*Id.*) She also used to enjoy flower gardening, but

24  she could no longer "bend over now or step on [a] shovel" without

25  pain. (*Id.*) She used to ride a bicycle in nice weather, but now

26  was unable to do so because of spasms in her legs and back. (A.R.

27  158) She was unable to sit, stand, or walk for long periods of

28  time, and she could not bend forward. (*Id.*)

62 - FINDINGS AND RECOMMENDATIONS

1   Wilcox remained active in the Grange and her church to the
2   extent possible, but she could not sit long enough for meetings.
3   She enjoyed playing board games and cards, but she was unable to
4   sit long enough to play games. (*Id.*)

5       In the "Remarks" section of the form, Wilcox stated:

6           I was active in my church.  I volunteered to
            assist the handicap[ped] and elderly with
7           transportation to their doctor appointments
            and helped them do their shopping for clothes
8           and food.  I also helped do their yard work if
            needed.
9
            Now I am the one who needs this help sometimes
10          It feels awkward to be on this end of things.

11  (A.R. 160)

12

13      **3.   *August 29, 2006, Hearing***

14      Wilcox is a high school graduate and has at least one year of
15  college.[6] Although her doctors released her to return to school at
16  one point, Wilcox still had trouble walking and never felt she
17  could return to classes.  (A.R. 695)  Prior to her fall in January
18  2004 (*see* A.R. 355), she had been a full-time student since the
19  summer term of 2003.  After her fall, she dropped out of classes
20  that semester, and she has never returned to school.  (A.R. 695,
21  697)

22      Wilcox's brother, who "has schizophrenia," lives with Wilcox
23  and her family, and Wilcox checks his medications every night to
24  ensure he has taken his pills.  (A.R. 708)  Wilcox described her
25  daily routine as follows:

26

27       [6]It appears Wilcox may have had one year of college, and then
    several years later went back to school to become a teacher. (*See*
28  A.R. 695)

1
2
3
4
5
6
7

> Well I get up about 8:00 and my brother goes out and he brings the newspaper in and I go out and walk around in the yard and sometimes I can't walk on the dirt surface, I have to walk on the pavement because it has to be totally flat for me. Some days I can walk in the yard. I do that for about half an hour and then I come back in and I'll sit down and read the newspaper and then after the newspaper I get up and I make our breakfast and I say our breakfast, I do my cereal and Tony [her brother] eats whatever he wants to eat and he actually does his own, too.

8  (A.R. 709)  Wilcox tries to walk a mile every day, but many times
9  she is not able to walk even past the end of her driveway due to
10 back pain.  (A.R. 710, 713)  She ordinarily drives ten miles to the
11 gym and works out three times a week, but at times, the ten-mile
12 drive is difficult due to pain in her back and legs.  (A.R. 710)
13 Wilcox and her brother do the grocery shopping together.  Wilcox
14 cooks supper when she feels able, and when she is "having a bad
15 time," her husband does the cooking.  (A.R. 709)  Her depression is
16 worse on days when she is unable to do what she sets out to do.
17 (A.R. 713)  She often begins a task and then has to stop and sit or
18 lie down due to pain.  Her pain sometimes is accompanied by crying
19 "[w]hen it gets overwhelming."  (*Id.*)  She stated that over the
20 previous five or six years, it appeared she had "lost a little
21 ground" each winter, with her condition worsening slightly each
22 year.  (A.R. 714)

23     Wilcox sometimes has difficulty "making a plan and staying on
24 target of things," and she "tend[s] to get distracted."  (A.R. 707)
25 She sometimes has trouble remembering what she reads enough to
26 follow a story, so she will make notes on index cards to help her
27 remember "the basic characters."  (A.R. 712)  She has had some
28

64 - FINDINGS AND RECOMMENDATIONS

problems finding her way to unfamiliar places.  She stated she
never had these types of problems before the bus accident. (*Id*.)

When Wilcox was in school, she used a tape recorder to record
the teachers' lectures because she often would have to stand up,
walk in the hallway for a few minutes, or lean against the wall in
the classroom.  In addition, she sometimes had trouble focusing on
written materials, and she would "have problems remembering what
[she was] reading and have to go over things many times."  (A.R.
711)  With the taped lecture, she was assured of not missing
portions of the lesson. (*Id*.)

The ALJ questioned Wilcox about two distinct time periods
reflected in Wilcox's treatment notes.  The first was the period
after the bus accident, when she initially injured her back.  It
appears from the record that she got treatment, recovered nicely,
moved to the country and began raising some chickens, and went back
to school to become a teacher.  Then the fall occurred at school,
and she never returned to school.  The ALJ could find no evidence
in the record to indicate Wilcox's physical condition deteriorated
enough from the fall to warrant her quitting school and not being
able to retrain and go back to work. (*See* A.R. 698-706)  He noted
that Dr. Weller had not addressed any change in Wilcox's condition,
yet Dr. Weller indicated Wilcox cannot work despite the surgeon
saying she can work.  As a result, the ALJ decided to order a
consultative examination by either an orthopedist or a neurologist.
(A.R. 706)  He wanted an objective evaluation by someone who could
look at the entire record and determine what new or current
findings would prevent Wilcox from all work when Drs. Gallo,
Purvis, Panum, and "everybody is saying she can work at a certain

65 - FINDINGS AND RECOMMENDATIONS

level.  There's a physical capacity evaluation everybody endorsed
that says light work and then things changed and yet no one has
pursued to figure out what, if anything, really happened to cause
that."  (A.R. 715; *see* A.R. 715-17)

The ALJ also had some concern about several references by
Wilcox's treating sources indicating Wilcox could benefit from some
mental health counseling, yet Wilcox had never seen a counselor.
Wilcox testified that she suffers from some depression when she is
unable to get around very well, but the depression is absent when
she is able to move better.  (A.R. 706-07)  The antidepressant
medications she has taken have been prescribed by her family
doctor, Dr. Purvis.  (*See* A.R. 701-02)

### 4.   *March 13, 2007, Hearing*

At the reconvened hearing, Wilcox amended her alleged
disability onset date to October 1, 2005.  (A.R. 722-23)  She
clarified that when she told Dr. Brewster, in October 2006, that
she generally stood for three hours a day, that was a total, not
three continuous hours.  She stated she would be on her feet for
awhile, then sit or lie down for 20 to 30 minutes, then get up and
walk around again.  (A.R. 729-30)

The ALJ again noted that of all Wilcox's treating sources,
Dr. Weller is the only one who has indicated Wilcox is completely
unable to work.  Her other treating sources "have all said [she]
could return to work in a limited category[.]"  (A.R. 732)  Wilcox
stated Dr. Panum encouraged her to return to school, but after her
fall, she was unable to return.  She testified she has not returned
to her condition prior to the fall.  (A.R. 733)

66 - FINDINGS AND RECOMMENDATIONS

1    Wilcox testified that Dr. Weller recommended vocational
2    rehabilitation, and Wilcox was working with Voc Rehab to determine
3    her capabilities and needs, and to help her identify jobs she might
4    be able to perform. She was scheduled to begin some three-hour
5    sessions through Voc Rehab for various types of training, and Voc
6    Rehab personnel were aware that Wilcox would have to get up and
7    move around during the three-hour training sessions. (A.R. 735-36)

8    Wilcox agreed that "on a good day," she is able to walk half
9    a mile with no symptoms. (A.R. 736-37) She stated her "good days"
10   occur once or twice a week. After she walks half a mile, she has
11   to sit or lie down. She comes back from her walk and sits down,
12   and if her symptoms are not relieved, then she will lie down, "get
13   up and do some floor exercises and just keep doing things until
14   [she] can get some relief." (A.R. 737) She also frequently takes
15   a hot bath after her walk. (A.R. 738) She tries to walk five
16   times a week, but there are days she is unable to walk half a mile
17   and at other times she is unable to take a walk at all. (*Id.*)

18   Wilcox described problems sleeping due to back pain. When she
19   has been in one position too long, she awakens and then is unable
20   to get back to sleep. She sometimes gets up and watches television
21   or walks around the house, and at times it takes a couple of hours
22   before she again is able to lie down and return to sleep. (A.R.
23   739-40)

24   Wilcox does home exercises for about half an hour each
25   evening, while she watches television. She does pool exercises
26   that she learned from the physical therapist each morning. Her
27   husband drives her to the pool, which takes about 20 minutes; she
28   is in the pool exercising for about 20 minutes; it takes her 15

67 - FINDINGS AND RECOMMENDATIONS

1  minutes to get dried off and dressed; and then it takes about 20
2  minutes for them to return home.  She usually lies down for about
3  20 minutes when she gets home from the pool.  (A.R. 741-42)

4      Wilcox stated she would not "be a very nice worker" if she had
5  to be on her feet for any length of time at a full-time job.  She
6  stated if she stands for too long, her legs "go into spasms" and
7  she gets "horrible spasms in [her] back as time progresses." (A.R.
8  742)  If she had a sit/stand option and could take breaks during
9  which she could lay down in her car, then she might be able to
10 work.  She stated that when she was in school, she would go to her
11 car between classes, recline the seat and lie down for a few
12 minutes, and that might work with an employer.  However, she would
13 need to be able to take breaks as needed, rather than on a set
14 schedule.  (A.R. 743)  Over the long term, Wilcox does not believe
15 she could sustain full-time work due to her pain.  (A.R. 744)

16

17 **D.    *Third-Party Testimony***

18     Wilcox's husband, Steven E. Wilcox, completed a Function
19 Report Adult - Third Party on March 20, 2004.  (A.R. 134-42)   He
20 stated he and Wilcox "live together, talk, watch TV, read, [and]
21 garden."  (A.R. 134)   Describing Wilcox's daily activities, he
22 stated that on some days, she is able to do "limited housework,
23 shopping, visiting, [but] other days she can only lay on [the]
24 couch and read or watch TV." (*Id.*)   On Wilcox's good days, she
25 feeds the chickens and dogs, but "on other days she is in too much
26 pain," and her husband does these tasks.  (A.R. 135)

27     Steven stated that before Wilcox's accident, she could do a
28 number of things she no longer can do, including driving a bus,

68 - FINDINGS AND RECOMMENDATIONS

doing heavy housework, gardening, hiking, camping, earning income, and playing with her grandchildren. (*Id.*)    He indicated pain interrupts Wilcox's sleep. (*Id.*)

Regarding Wilcox's ability to handle her personal care needs, Steven stated that on some days, Wilcox is unable to tie her shoes. At the time he completed the questionnaire, Wilcox could not sit in a bathtub; she could only take showers.  She cannot bend forward for long enough to shave her legs.  She requires a special toilet seat.  And she has bowel and bladder accidents due to loss of sensation. (*Id.*)  She has to use a medication journal to remember to take her medications.  (A.R. 136)

According to her husband, Wilcox is able to fix "simple meals that require little standing" because she "cannot stand longer than 1/2 hour." (*Id.*)  She prepares food for meals about three days per week, and he cooks on the other days.  Before her injury, Wilcox used to prepare large family dinners. (*Id.*)  She is able to do "limited laundry and cleaning that does not require bending," and she does these tasks for "less than 1/2 hour several times weekly." (*Id.*)  Her husband helps with the indoor chores and does all of the outdoor chores.   They hire someone to clean the floors and bathrooms. (*Id.*)

Steven stated Wilcox goes outside "almost daily," but she "cannot tolerate cold weather," and she uses a cane to walk outside. (A.R. 137, 140)  She can drive and ride in a car, and she can go out alone.  She shops for groceries and clothing, but her shopping only takes her about 1/2 hour per week. She is able to pay bills, count change, use a checkbook, and handle a savings account.

69 - FINDINGS AND RECOMMENDATIONS

1 (*Id.*)  Her condition has not affected her ability to handle money.
2 (A.R. 138)

3      Before her injury, Wilcox used to attend church regularly, and
4 visit family members who live out of town.  She enjoys talking with
5 family and friends on the phone and during personal visits.  Since
6 her injury, she can only attend church occasionally.  Steven stated
7 Wilcox "has good mental participation, not physical."  (A.R. 138)

8      According to Steven, Wilcox can pay attention for "hours" at
9 a time.  She follows written and spoken instructions "very well,"
10 and she gets along very well with others.  She handles stress and
11 changes in routine very well.  (A.R. 139-40)

12      In the "Remarks" section of the form, Steven stated Wilcox
13 "cannot lift grandchildren.  She was terminated from a job that she
14 loved (bus driver) and has trouble accepting that she was let go
15 because of an injury."  (A.R. 141)

16

17           ***III.   DISABILITY DETERMINATION AND BURDEN OF PROOF***
18 ***A.    Legal Standards***

19      A claimant is disabled if he or she is unable to "engage in
20 any  substantial  gainful  activity  by  reason  of  any  medically
21 determinable physical or mental impairment which . . . has lasted
22 or can be expected to last for a continuous period of not less than
23 12 months[.]"  42 U.S.C. § 423(d)(1)(A).

24      "Social Security Regulations set out a five-step sequential
25 process for determining whether an applicant is disabled within the
26 meaning of the Social Security Act."  *Keyser v. Commissioner*, ___
27 F.3d ___, 2011 WL 2138237, at *3 (9th Cir. June 1, 2011) (citing 20

28

70 - FINDINGS AND RECOMMENDATIONS

C.F.R. § 404.1520).  The Keyser court described the five steps in the process as follows:

> (1) Is the claimant presently working in a substantially gainful activity?  (2) Is the claimant's impairment severe?  (3) Does the impairment meet or equal one of a list of specific impairments described in the regulations?  (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Id.* (citing *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999)); *see Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001) (citing 20 C.F.R. §§ 404.1520 (b)-(f) and 416.920 (b)-(f)). The claimant bears the burden of proof for the first four steps in the process.  If the claimant fails to meet the burden at any of those four steps, then the claimant is not disabled. *Bustamante*, 262 F.3d at 953-54; *see Bowen v. Yuckert*, 482 U.S. 137, 140-41, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987); 20 C.F.R. §§ 404.1520(g) and 416.920(g) (setting forth general standards for evaluating disability); 404.1566 and 416.966 (describing "work which exists in the national economy"); 416.960(c) (discussing how a claimant's vocational background figures into the disability determination).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and word experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999).  If the Commissioner fails meet this burden, then the claimant is disabled, but if the

71 - FINDINGS AND RECOMMENDATIONS

Commissioner proves the claimant is able to perform other work which exists in the national economy, then the claimant is not disabled. *Bustamante*, 262 F.3d at 954 (citing 20 C.F.R. §§ 404.1520(f), 416.920(f); *Tackett*, 180 F.3d at 1098-99).

The ALJ determines the credibility of the medical testimony and also resolves any conflicts in the evidence. *Batson v. Comm'r*, 359 F.3d 1190, 1196 (9th Cir. 2004) (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)). Ordinarily, the ALJ must give greater weight to the opinions of treating physicians, but the ALJ may disregard treating physicians' opinions that are "conclusory, brief, and unsupported by the record as a whole, . . . or by objective medical findings." *Id.* (citing *Matney, supra*; *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001)). If the ALJ disregards a treating physician's opinions, "'the ALJ must give specific, legitimate reasons'" for doing so. *Id.* (quoting *Matney*).

The ALJ also determines the credibility of the claimant's testimony regarding his or her symptoms:

> In deciding whether to admit a claimant's subjective symptom testimony, the ALJ must engage in a two-step analysis. *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). Under the first step prescribed by *Smolen*, . . . the claimant must produce objective medical evidence of underlying "impairment," and must show that the impairment, or a combination of impairments, "could reasonably be expected to produce pain or other symptoms." *Id.* at 1281-82. If this . . . test is satisfied, and if the ALJ's credibility analysis of the claimant's testimony shows no malingering, then the ALJ may reject the claimant's testimony about severity of symptoms [only] with "specific findings stating clear and convincing reasons for doing so." *Id.* at 1284.

*Batson*, 359 F.3d at 1196.

72 - FINDINGS AND RECOMMENDATIONS

1   **B.    *The ALJ's Decision***

2        The ALJ found that Wilcox was insured through December 31,

3   2007, and she therefore had to establish disability on or before

4   that date.  (A.R. 24, 26)  He found Wilcox had not engaged in

5   substantial gainful activity since her amended alleged onset date

6   of October 1, 2005.  (A.R. 26)  He found Wilcox to have severe

7   impairments consisting of "degenerative disc disease of the lumbar

8   spine, obesity, and affective disorder." (*Id.*)  However, he further

9   found that her impairments, singly or in combination, do not meet

10  the Listing level of severity.  (A.R. 27)

11       Regarding Wilcox's mental impairment, the ALJ found Wilcox to

12  have mild restriction in her activities of daily living.  He noted

13  she performs "a rather wide range of activities, including meal

14  preparation, watching television, reading, bird watching and

15  embroidery," and "[h]er hygiene and grooming [are] good."  (A.R.

16  28)  The ALJ found Wilcox to have mild difficulties in social

17  functioning, and "no interpersonal problems." (*Id.*)  She has

18  experienced no episodes of decompensation of an extended duration.

19  (*Id.*)  Because Wilcox's mental impairment "does not cause at least

20  two 'marked' limitations or one 'marked' limitation and 'repeated'

21  episodes of decompensation," the ALJ found the criteria of listing

22  12.04, paragraph B, have not been satisfied.  He further found the

23  criteria of listing 12.04, paragraph C, have not been satisfied.

24  (*Id.*)

25       The ALJ found Wilcox "has the residual functional capacity to

26  perform light work" with the following additional restrictions:

27              [T]he claimant is able to perform light work
                with the ability to lift and carry 20 pounds
28              occasionally and 10 pounds frequently, with

> the ability to push/pull at these same cited
> levels.  The evidence has also convinced the
> [ALJ] that the claimant is able to sit for 6
> hours during the workday and stand/walk for
> the same length of time during the 8-hour day.
> Although occasionally able to reach overhead,
> she cannot bend and lift from floor level on a
> repetitive basis.  Also, the determination is
> made that the claimant needs to alternate her
> position during the day from sitting to
> standing to walking.
>
> The claimant's depression adds non-exertional
> limitations to her residual functional
> capacity. . . . [T]he claimant is moderately
> limited in her ability to carry out detailed
> instructions and in maintaining attention and
> concentration for extended periods.

(A.R. 29)

The ALJ found that although Wilcox's "medically determinable impairments could reasonably be expected to produce the alleged symptoms," her testimony regarding "the intensity persistence and limiting effects of these symptoms [was] not entirely credible." (A.R. 31)  He noted that after Wilcox's two surgeries in 2001, Dr. Gallo had released her "to work at the light level, full time work, with a change of position and no repetitive bending/twisting at the waist[.]"  (*Id.*, citing A.R. 227-28)  After Wilcox's slip-and-fall injury in January 2004, the ALJ noted "she underwent a short course of physical therapy and was returned to work with her prior restrictions."  (*Id.*, citing A.R. 354)  The ALJ cited progress notes from July 2005 through August 2007, indicating Wilcox had benefitted greatly from physical therapy and could sit for longer periods of time, perform housework if she paced herself, walk on her heels and toes, and perform her home exercises. (*Id.*; citations omitted)

74 - FINDINGS AND RECOMMENDATIONS

1    The ALJ further found the objective evidence does not support

2  Wilcox's claim that she is disabled due to her depressive disorder.

3  (A.R. 31-32; citing Dr. Joffe's evaluation results from October

4  2006, A.R. 480-86)  The ALJ indicated Wilcox's "numerous activities

5  undercut her allegations of disability," noting that in October

6  2006, Wilcox's "leisure activities included embroidery, making

7  Barbie clothes for her grandchildren, reading and spending time

8  with friends."  (A.R. 32; citation omitted)  She also was able to

9  drive a car, and she did two loads of laundry every other day.

10 (*Id.*)

11    From his review of the evidence, the ALJ reached the following

12 opinion regarding Wilcox's motivation to work:

13         The evidence shows that the claimant, although
           unable to return to her past work, has not
14         returned to any type of employment in the
           ensuing four years.  She has not returned to
15         work even though all the doctors (except
           Annette Weller, M.D.) concluded that she was
16         able to do so.  She settled her worker's com-
           pensation claim to go to Lane County Community
17         College [citation omitted], but then reported
           an alleged slip on a wet floor at the college,
18         dropped out of school, and made no effort to
           return.  She made a lifestyle change and moved
19         to a less stressful environment in the country
           and reported raising chickens and enjoying
20         life [citation omitted].   The resulting
           impression is an individual who is unin-
21         terested in returning to work or returning to
           training that supposedly would allow a return
22         to work.

23 (*Id.*)

24    The ALJ gave little weight to Dr. Weller's opinion that Wilcox

25 would be unable to maintain a regular work schedule and would miss

26 more than two days of work a month due to pain flareups.  The ALJ

27 observed that Dr. Weller "failed to provide any objective findings

28 to support her conclusions," and the doctor's opinion letter was

75 - FINDINGS AND RECOMMENDATIONS

1  "generally a recapitulation of what [Wilcox] told this physician."

2  (*Id.*)  The ALJ further found that Dr. Weller's conclusions were

3  unsupported even by her own clinical records. (*Id.*)  He noted the

4  doctor's notes from May 2005 indicated Wilcox "generally had normal

5  ranges of motion," and her "reflexes were described as normal."

6  *Id.*  In the doctor's February 6, 2007, letter, she "cited such

7  normal findings as 5/5 muscle strength throughout the lower

8  extremities," and noted Wilcox "had 45 degrees of flexion in the

9  lumbar spine with 30 degrees of extension, and 20 degrees of side

10  bending to the right and left."  (A.R. 32-33)  The ALJ concluded

11  that these objective findings did not support Dr. Weller's

12  conclusion that Wilcox could not perform any type of work.  (A.R.

13  33)

14      The ALJ further gave no weight to Dr. Joffe's conclusion that

15  Wilcox would be unable to maintain a regular work schedule given

16  her physical condition.  The ALJ found that "Dr. Joffe, who is a

17  psychologist, was out of her area of expertise in determining

18  physical impairments prevented a return to work.  In fact, she was

19  also dabbling in vocational findings, which again is outside her

20  expertise as a psychologist."  (A.R. 33)

21      Regarding the opinions expressed by Steven Wilcox, the ALJ

22  found they did not constitute evidence to show Wilcox is incapable

23  of light work activity with limitations.  He also found inconsis-

24  tencies between Steven's statements and Wilcox's declarations.

25  (*Id.*)  He specifically found Steven's statement that Wilcox was

26  unable to do laundry to be inconsistent with Wilcox's

27  representation that she "did two loads of laundry every other day,"

28  and Steven's statement that Wilcox "no longer does extensive

76 - FINDINGS AND RECOMMENDATIONS

walking" to be inconsistent with Wilcox's statement that "she
walked a one mile loop around her home."  *Id.*

The ALJ found that although Wilcox clearly cannot return to
her past work as a bus driver, she retains the residual functional
capacity to perform other jobs that exist in significant numbers in
the national economy.  He relied on the VE's testimony in giving
examples of work Wilcox could perform, including small products
assembler, parking lot cashier, and "table worker."  (A.R. 34)

Because the ALJ found that Wilcox could make a successful
adjustment to other work, he found her not to be disabled at any
time through the date of his decision (July 26, 2007).  (A.R. 34-
35)

## IV.    STANDARD OF REVIEW

The court may set aside a denial of benefits only if the
Commissioner's findings are "'not supported by substantial evidence
or [are] based on legal error.'"  *Bray v. Comm'r*, 554 F.3d 1219,
1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d
880, 882 (9th Cir. 2006)); *accord Black V. Comm'r*, slip op., 2011
WL 1930418, at *1 (9th Cir. May 20, 2011).  Substantial evidence is
"'more than a mere scintilla but less than a preponderance; it is
such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion.'"  *Id.* (quoting *Andrews v.
Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The court "cannot affirm the Commissioner's decision 'simply
by isolating a specific quantum of supporting evidence.'"  *Holohan
v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett
v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1998)).  Instead, the court

77 - FINDINGS AND RECOMMENDATIONS

1  must consider the entire record, weighing both the evidence that

2  supports the Commissioner's conclusions, and the evidence that

3  detracts from those conclusions. *Id.* However, if the evidence as

4  a whole can support more than one rational interpretation, the

5  ALJ's decision must be upheld; the court may not substitute its

6  judgment for the ALJ's. *Bray*, 554 F.3d at 1222 (citing *Massachi v.*

7  *Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

8

9                          *V.    DISCUSSION*

10      Wilcox argues the ALJ erred in five respects, each of which is

11 discussed below.

12

13 *A.    Knee arthritis*

14      Wilcox argues the ALJ erred in failing to include her knee

15 arthritis as a severe impairment. *See* Dkt. #13, p. 13; Dkt. #15,

16 pp. 103. She notes that x-rays of her knee revealed significant

17 osteoarthritic changes, and she complained of severe symptoms to

18 her doctors including "numbness and tingling over the right lateral

19 knee with prolonged sitting for more than ten or fifteen minutes."

20 Dkt. #13, p. 13 (citing A.R. 423).

21      Wilcox further argues that even if the ALJ considered her knee

22 condition to be accommodated by "the 'sit-stand' option included in

23 the residual functional capacity assessment," *id.*, the ALJ erred in

24 failing to consider her knee condition in finding the medical

25 evidence did not fully support Wilcox's complaints. *Id.* (citing

26 A.R. 31)

27      The Commissioner argues Wilcox failed in her burden to

28 establish that her knee condition significantly limits her ability

78 - FINDINGS AND RECOMMENDATIONS

1  to perform basic work activities, and that the condition lasted for
2  twelve continuous months. Dkt. #14, p. 6. He notes the 2004 x-ray
3  to which Wilcox refers in her brief was not accompanied by any
4  physician's opinion that the osteoarthritic changes in her knee
5  caused any functional limitations. He further argues Wilcox's only
6  other evidence of her knee condition is her subjective reports to
7  Dr. Weller in October 2005 and February 2006. *Id.*, p. 7.

8       The Commissioner further argues that even if the ALJ failed to
9  find Wilcox's knee condition was "severe," the error was harmless
10 because step two of the sequential evaluation process was resolved
11 in Wilcox's failure. *Id.*, p. 8 (citing *Burch v. Barnhart*, 400 F.3d
12 676, 682 (9th Cir. 2005)).

13      The first record evidence of Wilcox's knee problems was a call
14 to Dr. Purvis on November 27, 2001, when she complained of knee
15 pain and wondered if she might have "gout" in her knees. She saw
16 a physical therapist the next day and reported that she had been
17 experiencing knee pain that was limiting her walking somewhat.
18 (A.R. 376, 278) Further therapy notes from this time period do not
19 mention ongoing knee problems.

20      When Wilcox saw Dr. Purvis in January 2004, after falling at
21 school, she stated she had injured her left knee. Although she had
22 used crutches for a few days, by the time she saw him, two weeks
23 after the fall, she was no longer using the crutches and reported
24 that her pain was subsiding. (A.R. 371) X-rays of her left knee,
25 taken on February 2, 2004, showed "[o]steoarthritic changes . . .
26 in all three compartments, especially severe in the patellofemoral
27 compartment." (A.R. 358) However, again, there are no treatment
28 or physical therapy notes from this time period showing any ongoing

79 - FINDINGS AND RECOMMENDATIONS

problems with her knee.  There is brief mention in Dr. Purvis's
progress notes from March 4, 2005, indicating Wilcox had "arthritis
in the left knee, which [had] been x-rayed in the past," (A.R.
415), but no indication that he recommended any type of treatment
or that her knee problem was interfering with her life.

The only evidence of treatment for knee problems is from
October 2005, when Wilcox reported some knee pain after walking at
the mall with a friend, and she was noted to be using a cane
because her knee wanted to hyperextend.  Two physical therapists
agreed that Wilcox's knee problem "appear[ed] to be a lax
[posterior cruciate ligament] PCL." (A.R. 440)  They suggested she
obtain a brace to prevent her knee from hyperextending.  Dr. Weller
prescribed a neoprene sleeve, recommending Wilcox use the sleeve
when walking to reduce any further injury.  (A.R. 428; see A.R.
532-33)  Wilcox complained of increased knee pain on December 22,
2005, but she stated it was typical for her to have increased pain
in the cold winter months.  (A.R. 425)

Although the record contains evidence that Wilcox experienced
periodic knee pain, there is no evidence that her knee problems
either lasted for twelve continuous months or severely limited her
ability to perform basic work activities.  The court finds the ALJ
did not err in failing to include Wilcox's knee arthritis as a
"severe" impairment at step two of the sequential analysis.

However, contrary to the ALJ's conclusion (see A.R. 31), the
court further finds the medical evidence of Wilcox's knee problems
and pain lend credibility to her testimony regarding the intensity,
persistence, and limiting effects of her symptoms overall.

80 - FINDINGS AND RECOMMENDATIONS

**B.   *Credibility analysis***

Wilcox argues the ALJ erred in failing to give clear and convincing reasons for rejecting her subjective complaints. Dkt. #13, pp. 14-16; Dkt. #15, pp. 3-5. The Commissioner argues the ALJ did, in fact, give clear and convincing reasons for rejecting Wilcox's subjective complaints. Dkt. #14, pp. 8-11. He argues the ALJ "provided specific findings and articulated clear and convincing reasons for rejecting [Wilcox's] testimony." *Id.*, p. 10 (citing A.R. 30-32).

In finding Wilcox's subjective testimony not to be fully credible, the ALJ relied heavily on the fact that until Wilcox began seeing Dr. Weller in 2005, all of her treating sources eventually had released her to perform light work with some restrictions, and none of them ever opined she would be completely unable to work. However, Wilcox does not allege disability prior to October 2005, so the fact that her treating sources prior to that time had released her to work is not surprising, nor is that fact relevant to the present inquiry. The evidence indicates that each time Wilcox underwent physical therapy, her symptoms improved dramatically, sometimes resolving completely, and she was released from treatment to continue with her home exercises. However, she needed repeated courses of physical therapy on an ongoing basis.

While Wilcox acknowledges that "she has improved each time that she had physical therapy and it brings her through [each] painful episode," she notes that she has continued to complain of "periodic flareups of pain and radiculitis." Dkt. #13, p. 14. The evidence indicates that if Wilcox were required to take time off work for physical therapy upon each flareup of pain, she would be

81 - FINDINGS AND RECOMMENDATIONS

1  unable to sustain full-time employment. Similarly, given the

2  amount of time Wilcox spends daily on walking and other forms of

3  exercise, it is unlikely she would be employable in the competitive

4  job market. (*See* A.R. 748-52, VE's testimony)

5      The ALJ also relied on the fact that after Wilcox's "alleged"

6  fall at school in January 2004, she "made no effort to return,"

7  instead making "a lifestyle change and mov[ing] to a less stressful

8  environment in the country and . . . raising chickens and enjoying

9  life." (A.R. 32)  The ALJ noted Wilcox had "settled her worker's

10 compensation claim to go to Lane County Community College," but

11 then had made voluntary lifestyle changes and failed to complete

12 her course work. *Id.*

13     In response, Wilcox testified she attempted to return to

14 school, but she had concerns about her ability to carry her books

15 or pull them on a cart. She reported this fact to Dr. Weller, and

16 stated she was continuing to have "intermittent flare-ups of her

17 pain lasting for up to one week at a time," and her back and leg

18 pain caused her "difficulty walking and occasionally some reduced

19 balance as well." (A.R. 434)  Dr. Weller's conclusion that Wilcox

20 had "some persistent findings consistent with a right L5

21 radiculitis and some dysesthetic pain" (A.R. 437) was supported by

22 her objective examination of Wilcox. Although the ranges of motion

23 in Wilcox's hips, knees, ankles, and lower extremities were within

24 normal limits, ranges of motion in her lumbar spine were not.

25 Standing flexion of the lumbar spine was 35 degrees, with increased

26 pain in the right sacroiliac area; 15 degrees of extension, with 25

27 degrees being normal; and only five degrees of lateral bending on

28 the left and ten degrees on the right (with 25 degrees being normal

82 - FINDINGS AND RECOMMENDATIONS

1 for each side), with increased pain on the right. (A.R. 435)  She
2 exhibited reduced sensation to light touch on her right posterior
3 thigh, and reduced pinprick sensation on the right lateral plantar
4 foot and heel.  (A.R. 436)  These findings are consistent with
5 Wilcox's subjective complaints of back and leg pain that could
6 cause difficulty with walking and occasional reduced balance.  The
7 doctor's findings over time also support the conclusions in her
8 opinion letters that Wilcox would be unable to sustain a regular
9 work schedule and likely would miss more than two days of work a
10 month due to pain flareups.

11 Wilcox's attempt to return to school despite her ongoing
12 symptoms is analogous to a claimant's attempt to return to work
13 despite pain and limitations.  The Ninth Circuit has held that a
14 claimant's attempt to work that fails due to ongoing pain and other
15 limitations actually supports a claimant's allegations of disabling
16 pain. *See Lingenfelter v. Astrue*, 504 F.3d 1028, 1038 (9th Cir.
17 2007) (citing, *inter alia*, *Rosario v. Sullivan*, 875 F. Supp. 142,
18 146 (E.D.N.Y. 1995) "(holding that substantial evidence did not
19 support the ALJ's decision that claimant was not disabled, in part
20 because claimant's unsuccessful work attempt weighed in favor of a
21 disability finding)"; *Reddick v. Chater*, 157 F.3d 715, 722 (9th
22 Cir. 1998) "('Several courts, including this one, have recognized
23 that disability claimants should not be penalized for attempting to
24 lead normal lives in the face of their limitations.')").  Wilcox's
25 unsuccessful attempt to return to school after her January 2004
26 injury is additional evidence that she suffered disabling pain.
27 *Id.*  In addition, unlike many claimants, Wilcox's treating sources
28 repeatedly noted that she was extremely compliant with all

83 - FINDINGS AND RECOMMENDATIONS

1  treatment recommendations and in her home exercise regimen, yet
2  despite her efforts, her condition failed to improve.

3      The ALJ also noted that Wilcox at times reported she was pain
4  free, and she was walking a mile a day.  Both Wilcox and her
5  husband stated Wilcox walked a mile a day on "good days," but there
6  were other days when she walked shorter distances or was unable to
7  walk at all.  The Social Security Administration recognizes that a
8  claimant's "'[s]ymptoms may vary in their intensity, persistence,
9  and functional effects, or may worsen or improve with time, and
10 this may explain why the individual does not always allege the same
11 intensity, persistence, or functional effects of his or her
12 symptoms.'"  *De Herrera v. Astrue*, 372 Fed. Appx. 771, 775 (9th
13 Cir. 2010) (quoting SSR 96-7p).

14     Further, the ALJ failed to discuss the side effects of
15 Wilcox's medications, which she indicated cause her to feel
16 lethargic and "drugged feeling," and cause her to have an "abnormal
17 sleep pattern." (A.R. 152) *See Whitehorn v. Astrue*, 321 Fed.
18 Appx. 679, 682 (9th Cir. 2009) (discussing SSR 96-7p, which "sets
19 forth "factors an ALJ may consider when disregarding a claimant's
20 subjective complaints").  The ALJ listed the factors enumerated in
21 SSR 96-7p, *see* A.R. 30, but then failed to acknowledge Wilcox's
22 evidence regarding the side effects of her medications and to
23 address their effects on her ability to work.

24     The ALJ further relied on Wilcox's "numerous activities,"
25 citing her "leisure activities [that] included embroidery, making
26 Barbie clothes for her grandchildren, reading and spending time
27 with friends." (A.R. 32).  He also noted she drove a car, and did
28 two loads of laundry every other day. (*Id.*)  He found these

84 - FINDINGS AND RECOMMENDATIONS

activities "undercut [Wilcox's] allegations of disability. (*Id.*; *see* A.R. 31-32). These activities are minimal, and are not inconsistent with Wilcox's claim of disabling pain. Although an ALJ "may reject a claimant's symptom testimony if the claimant is able to spend a substantial part of her day performing household chores or other activities that are transferable to a work setting," a claimant need not "be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication." *Smolen v. Chater*, 80 F.3d 1273, 1284 n.7 (9th Cir. 1996) (citing *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). Wilcox's daily activities, even on her best days, would not transfer easily into "a work environment where it might be impossible to rest periodically or take medication," *id.*, or allow her to engage in the multiple daily exercises she attempted in order to improve her condition.

The court finds the ALJ erred in failing to provide clear *and convincing* reasons for rejecting Wilcox's subjective testimony regarding her pain and limitations.

## C.    Rejection of Dr. Weller's opinions

Wilcox argues the ALJ erred in failing to give clear and convincing reasons for rejecting Dr. Weller's opinions regarding her condition and functional limitations. Dr. Weller is Wilcox's treating physician. Therefore, her opinion ordinarily would be entitled to great weight. *Batson*, 359 F.3d at 1195. If the medical opinions differ, then the ALJ must resolve the conflict, giving "'specific, legitimate reasons for disregarding the opinion

of the treating physician.'" *Id.* (quoting *Matney v. Sullivan*, 981
F.2d 1016, 1019 (9th Cir. 1992)).  Wilcox argues the ALJ failed to
give appropriate reasons for rejecting Dr. Weller's opinions.  Dkt.
#13, pp. 16-18; Dkt. #15, pp. 6-7.

The Commissioner argues Wilcox has "failed to cite any
objective evidence of record that would support Dr. Weller's 2006
and 2007 opinions that she was unable to perform any sustainable
work activity."  Dkt. #14, p. 11.  He notes the doctor's opinions
were given in a format that provided "little opportunity for the
physician to explain the bases of [her] opinion," a format the
Ninth Circuit has held is "entitled to little weight." *Id.* (citing
*Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996)).  The ALJ found
Dr. Weller's opinions to be conclusory, based on Wilcox's
subjective characterization of her symptoms, and unsupported by
objective medical findings.  *Id.*, pp. 11-12.

The Commissioner observes that Dr. Weller indicated Wilcox
would need to change positions frequently, "alternating between
sitting and standing and occasionally lying supine."  Dkt. #14,
p. 12 (citing A.R. 477).  However, the Commissioner argues "the
ALJ's findings accounted for alternate sitting and standing," (A.R.
29), and the ALJ found Dr. Weller's statement that Wilcox must lie
down during the day due to pain to be "unsupported by any evidence
in the letter or anywhere in the medical record." Dkt. #14, p. 12.

First, as discussed above, Dr. Weller's treatment notes and
objective findings support her diagnosis of Wilcox's ongoing
medical problems.  Objective findings also supported Wilcox's
subjective complaints to the doctor.  Second, an ALJ cannot reject
a claimant's subjective complaints "solely because the degree of
86 - FINDINGS AND RECOMMENDATIONS

1  pain alleged by the claimant is not supported by objective medical

2  evidence." *Bunnell v. Sullivan*, 947 F.2d 341, 347 (9th Cir. 1991).

3  As the Ninth Circuit observed in *Fair v. Bowen*, 885 F.2d 597, 601

4  (9th Cir. 1989), "[P]ain cannot be objectively verified or measured

5  . . . [and] the very existence of pain is a completely subjective

6  phenomenon.  So is the degree of pain."  Indeed, it would be

7  difficult, if not impossible, for a physician's objective

8  examination to substantiate a patient's pain level that would

9  require her to lie down periodically throughout the day.

10     The court finds more persuasive Wilcox's ongoing complaints of

11 pain, which she voiced to Dr. Weller, to Dr. Joffe, and in her

12 hearing testimony.  In all these instances, Wilcox stated she often

13 needs to lie down, and lying down is effective in relieving her

14 pain if she can lie down soon after the onset of pain.  Wilcox told

15 Dr. Joffe that her need to lie down and rest her back frequently

16 has been present since her accident in 2000.  (A.R. 483)  There is

17 no substantial evidence in the record to contradict Wilcox's

18 assertion that she needs to lie down from time to time to relieve

19 her pain.  Indeed, her testimony on this topic is even more

20 credible when viewed in the light of her extensive efforts to

21 rehabilitate herself, drawing comments about her extraordinary

22 efforts from her treating medical providers.  It is far more

23 credible for a person trying to comply with exercise and

24 rehabilitation efforts to develop pain and the need to rest than it

25 is for a person to refuse to participate in such activities based

26 on the complaint that pain prevents them from doing so.

27     Returning to the ALJ's rejection of Dr. Weller's opinion that

28 Wilcox's back condition "is sufficiently severe that she would be

87 - FINDINGS AND RECOMMENDATIONS

unable to maintain a regular work schedule and would miss more than two days a month due to flareups of pain" (A.R. 477-78), the court finds the ALJ failed to give specific, *legitimate* reasons for discounting Dr. Weller's opinions.  The doctor's opinions are supported by the longitudinal records of Wilcox's care, by objective findings from the doctor's own examinations, and by the testimony of Wilcox and her husband.

### D.    Consideration of Steven Wilcox's statement

Wilcox argues the ALJ erred in his consideration of her husband's statement.  Dkt. #13, pp. 18-19.  The Commissioner argues the ALJ's treatment of Steven Wilcox's statement "was reasonable and supported by the record."  Dkt. #14, p. 13.

The ALJ indicated he "carefully considered" Steven Wilcox's statement, but he found it to be inconsistent with other evidence of record and not to constitute evidence that Wilcox is incapable of light work.  (A.R. 33)  The ALJ first noted Steven indicated Wilcox was unable to do laundry, but Wilcox stated she does two loads of laundry every other day. (*Id.*)  This is a mischaracteri-zation of Steven's statement.  Rather than stating Wilcox was unable to do laundry, Steven stated she could do "limited laundry and cleaning that does not require bending." (A.R. 136)  Wilcox similarly stated, in 2004, that she could do "limited laundry and kitchen cleaning, no bending and less than 1/2 hour standing." (A.R. 155)  In October 2006, Wilcox told Dr. Joffe that she does two loads of laundry every other day.  (A.R. 482)  However, she also told Dr. Joffe she is able to "stand for only 30-45 minutes at a time, and then she must either lie down or walk to relieve the

1  pain in her back and legs." (A.R. 483)  The court does not find

2  Steven Wilcox's statement to be inconsistent with Wilcox's

3  declarations.

4      Second, the ALJ found Steven's statement that Wilcox "no

5  longer does extensive walking" to be "inconsistent with [Wilcox's

6  admission that she walked a one mile loop around her home." (A.R.

7  33)  Again, the ALJ's statement mischaracterizes the evidence of

8  record.  Steven stated, in 2004, that Wilcox could walk "1 mile on

9  good days." (A.R. 139)  In 2006, Wilcox told Dr. Joffe she "tries"

10  to walk a mile a day, and "[o]n good days, she can walk a mile loop

11  around her house.  The other days, she walks to the end of the

12  block and back." (A.R. 482)  The court finds these statements to

13  be consistent.

14      The record evidence is consistent with Steven Wilcox's

15  statements regarding his wife's symptoms and limitations.  The

16  court finds the ALJ erred in failing to give adequate weight to

17  this lay evidence.

18

19  **E.   *Wilcox's ability to work***

20      Wilcox argues the ALJ erred in concluding she retains the

21  residual functional capacity to sustain competitive work.  The

22  court agrees.  The record fails to contain substantial evidence to

23  support the ALJ's conclusion, and actually supports the opposite

24  result.  Giving Wilcox's and her husband's evidence proper weight,

25  and giving proper weight to the opinions of Wilcox's treating

26  physician, Wilcox clearly could not sustain competitive work on a

27  sustained basis.  The VE agreed that none of the job examples he

28  provided would allow an employee the freedom to lie down during the

89 - FINDINGS AND RECOMMENDATIONS

1  day, or to take the time necessary to do exercises or take hot

2  baths to relieve pain.   The Commissioner's brief argument to the

3  contrary is unavailing.   *See* Dkt. #14, p. 14.

4

5                      *VI.   CONCLUSION*

6          The  Ninth  Circuit  has  made  it  clear  that  when  the

7  administrative  record  has  been  "developed  fully  and  further

8  administrative  proceedings  would  serve  no  useful  purpose,  the

9  district  court  should  remand  for  an  immediate  award  of  benefits."

10  *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004) (citing

11  *Smolen*, 80 F.3d at 1292; *Varney v. Sec'y of Health & Human Servs.*,

12  859 F.2d 1396, 1399 (9th Cir. 1988)).  The *Benecke* court explained:

13              More specifically, the district court should
              credit evidence that was rejected during the
14              administrative  process  and  remand  for  an
              immediate award of benefits if (1) the ALJ
15              failed to provide legally sufficient reasons
              for rejecting the evidence; (2) there are no
16              outstanding  issues  that  must  be  resolved
              before a determination of disability can be
17              made; and (3) it is clear from the record that
              the ALJ would be required to find the claimant
18              disabled were such evidence credited. [Cita-
              tions omitted.]

19

20  *Benecke*, 379 F.3d at 593; *accord Strauss v. Comm'r*, 635 F.3d 1135,

21  1138 (9th Cir. 2011).  More to the point, the *Benecke* court noted

22  such a case should not be remanded for the sole purpose of allowing

23  the  ALJ  "to  make  specific  findings  regarding  excessive  pain

24  testimony."  *Id.*  Instead, the court itself considers the "relevant

25  testimony to be established as true," and remands for an immediate

26  award of benefits.  *Id.* (citations omitted).

27          All three of the *Benecke* factors are present here.  The ALJ

28  failed to provide legally sufficient reasons for his rejection of

90 - FINDINGS AND RECOMMENDATIONS

1  Dr. Weller's opinion and Steven Wilcox's statement, and for his

2  assessment of Wilcox's credibility.   There are no outstanding

3  issues that must be resolved in the case before a disability

4  determination can be made.  The court finds it is clear from the

5  evidence of record that if the rejected evidence were credited, as

6  it should be, then the ALJ would be required to find Wilcox

7  disabled.

8      Accordingly, I recommend the ALJ's decision be reversed and

9  the case be remanded for immediate calculation and award of

10 benefits.

11

12              *VII.   SCHEDULING ORDER*

13     These Findings and Recommendations will be referred to a

14 district judge. Objections, if any, are due by **July 15, 2011.**  If

15 no objections are filed, then the Findings and Recommendations will

16 go under advisement on that date.  If objections are filed, then

17 any response is due by **August 1, 2011.**  By the earlier of the

18 response due date or the date a response is filed, the Findings and

19 Recommendations will go under advisement.

20     IT IS SO ORDERED.

21                    Dated this 27th day of June, 2011.

22                    /s/ Dennis J. Hubel

23                    _____

24                    Dennis James Hubel
                       Unites States Magistrate Judge

25

26

27

28

91 - FINDINGS AND RECOMMENDATIONS